William Hamilton LITTLE, Appellant,

v.

The STATE of Texas, Appellee.

No. 69476.

Court of Criminal Appeals of Texas,
En Banc.

March 23, 1988.

Rehearing Denied April 27, 1988.

Certiorari Denied Oct. 31, 1988.
See 109 S.Ct. 328.

Harlan D. Friend, Liberty, Freece R. Elliott, Crosby, for appellant.

Michael R. Little, Dist. Atty., Liberty, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This is an appeal from a conviction of capital murder, V.T.C.A., Penal Code, § 19.03(a)(2), in which the death penalty was imposed by the court following affirmative answers by the jury to the two special issues submitted pursuant to Article 37.-071(b)(1) and (2), V.A.C.C.P. We will affirm the conviction.

Appellant raises nine points of error, seven of which complain of alleged error during voir dire. In his eighth point of error, appellant claims that the evidence is insufficient to support the jury verdict that appellant was in the course of committing or attempted to commit aggravated sexual assault, arguing that the evidence failed to exclude a reasonable inference other than appellant's guilt. In his ninth point of error, appellant claims that the trial court erred in admitting appellant's statement and "other evidence" which appellant claims were obtained as a result of an illegal search and seizure. Appellant's points of error will be treated in the order in which they were raised.

In order to place the discussion of appellant's arguments into proper perspective, we first offer a brief summary of the facts of this case. On the morning of December 3, 1983, Michael John Rammel found the body of Marilyn Peter in her home. He and Pat Faulkner arrived to install her clothes dryer. After installing the dryer, Rammel went to the front door where he found blood on the doorjamb. Rammel knocked on the door and entered after he heard a baby crying. He found Peter's small son crying on top of the kitchen counter. There was blood all over the kitchen and living room areas. The body of Marilyn Peter was lying in the living room, with numerous stab wounds on virtually all areas of her body. Robert Dunn, the police investigator also described the scene of the murder in like manner, although in greater detail.

Peter's body sustained numerous injuries which the State's expert witness Aurelio A. Espinosa described for the jury. Dr. Aurelio, a specialist in forensic pathology, performed an autopsy on the victim on December 4, 1983. He found evidence indicating that the victim had been the subject of sexual assault immediately prior to her murder. In addition, the autopsy indicated that the cause of death was five stab wounds to the victim's chest, but that the victim also was subjected to manual strangulation sufficient to cause death in the absence of any stab wounds. The wounds to the victim were of such a nature that in Dr. Aurelio's opinion Peter sustained them in the process of defending herself from attack.

Appellant, William Hamilton Little, was arrested at his place of residence on another, unrelated charge during the early morning hours of December 6, 1983. During interrogation at the police station following his arrest, appellant gave a written statement which later was introduced at his trial. The State introduced an edited version of the confession, and the appellant introduced the balance under the rule of completeness. See Article 38.24, V.A.C.C. P. In the statement appellant admitted he went to the home of Marilyn Peter on the night of her murder, that he had sexual intercourse with her, and that he killed Peter with a butcher knife which was in her apartment. Appellant claimed in the portion of the statement he introduced that the sexual intercourse with Peter was consensual. He further claimed that he killed her only after she attacked him with the knife, which he took away from her, and after she repeatedly attacked him while he kept her away by stabbing her.

Glenn Wesley Harwell testified as to the events which took place in the company of appellant on the night of December 2, 1983, hours before the murder of Peter. He was in the company of appellant while at "The Game Room," a recreation facility located in the Old Snake River Subdivision in which both appellant and Peter lived. During this night at "The Game Room," appellant consumed beer and marihuana, and Harwell was of the opinion that appellant became intoxicated over the course of the evening. Harwell related that appellant was "talking crazy" during the evening, and that appellant had claimed to have scalped people and cut them up when he lived in New York. According to Harwell, appellant was carrying a knife that night, and had tried to start fights with both strangers and friends. Harwell gave appellant a ride to his home, arriving at approximately 1 a.m., during which ride appellant continued to threaten to "whoop" Harwell if he would pull the truck over to the side of the road.

Joseph Alba also was in the company of appellant during this time. He related that appellant said that he was "going to do something crazy or stupid or go out and kill somebody". Alba also told how appellant had previously told him of his sexual desire for Marilyn Peter. Alba indicated that he and Harwell left appellant alone at appellant's residence at around 1:30 a.m. on December 3, 1983.

Marion J. "Bubba" Zbranek, Jr., who lived with the deceased's sister, testified that he saw Marilyn Peter at her residence during the late night hours of December 2, or the early morning hours of December 3, 1983. At that time, she appeared calm and showed no signs of any injury. There also

was no sign of struggle or anything unusual in her residence. Alicia Alba drove by the Peter home early on the morning of December 3, 1983, and saw a male individual with long hair and a beard standing in the doorway of the victim's home. Alba's description of the individual was consistent with the appearance of appellant at that time. She noticed no vehicles other than the victim's automobile parked outside of the house. The testimony of several witnesses indicated that the distance between the home of the victim and that of appellant was 1.5 to 2 miles and could be walked in approximately thirty minutes. Other facts concerning this crime will be set out as they are relevant to appellant's points of errors.

In his first four points of error appellant complains that the trial court abused its discretion in granting the State's challenges for cause to veniremen John Pratt, Gordon McIlvain, Patricia Berrote and Edwin M. Tyler. Each challenge was based on the ground that each such venireman would hold the State to a more stringent standard of proof than that of beyond a reasonable doubt. Article 35.16(b)(3), V.A. C.C.P., provides for the exclusion of a venireman who "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction *or punishment.*" (Emphasis supplied.)

Venireman Pratt stated that although he favored the death penalty he could not vote to assess it, then qualified his statement that before he could vote so that the death penalty could be imposed there "couldn't be the least doubt in my mind." He explained he would have to be convinced "beyond any doubt," that he understood the difference between "a reasonable doubt" and "no doubt," and that he would require proof leaving him with no doubt at all. Although he subsequently stated in response to an inquiry by appellant's counsel that he could follow the reasonable doubt standard in answering the special issues on punishment, he, still later, made clear in response to the court's interrogation, he would hold the State to an "any doubt" standard.

Venireman McIlvain gave similar responses. He stated he would have difficulty in assessing the death penalty and would have to be convinced beyond any doubt whatsoever, and have to be absolutely sure. Although the defense attempted to rehabilitate McIlvain he made clear that he would have to be convinced beyond any doubt, whether reasonable or not.

At first venireman Patricia Berrote stated she would require the burden of proof to be beyond any doubt at both the guilt and penalty stages of the trial. She then switched and agreed it need be only beyond a reasonable doubt. Upon further questioning she indicated that reasonable doubt meant "no doubt in my mind at all," and that if she had a doubt it would automatically be a reasonable doubt. Still later she seemed to accept the reasonable doubt standard as to the special issues at the penalty stage of the trial. Thereafter she indicated her difficulty with circumstantial evidence, and stated she would answer the special issues "no" if the proof offered was by circumstantial evidence. She was rehabilitated by defense counsel's interrogation explaining circumstantial evidence, and stated she could return affirmative answers to the special issues based on circumstantial evidence. However, she then told the prosecutor that the circumstantial evidence would have to convince her beyond any doubt. Later Berrote indicated that at the guilt stage there would be a difference beyond a reasonable doubt standard and beyond any doubt standard, but at the penalty stage the two terms had the same meaning to her. Later Berrote told the court she would have to be absolutely certain and have no doubt whatsoever before answering "yes" to the special issues.

Venireman Tyler related he would require proof without any doubt in his mind before he could vote so that the death penalty would be assessed. He answered "yes" when asked if he would require proof before an iota of doubt. Tyler stated he could abide by the "reasonable doubt" standard in a murder case, but not in a capital murder case. Although defense counsel sought to rehabilitate Tyler he indicated he would require absolute certainty.

Finally, Tyler, in response to the court's questioning, stated he would vote "no" in answer to the special issues if he had "the slightest iota of a doubt."

■ We cannot conclude that the trial judge abused his discretion in sustaining the State's challenges for cause to the named jurors. The State is clearly entitled to challenge for cause a venireman who could not follow the law on the burden of proof. See Article 35.16(b)(3), supra; *Jackson v. State*, 745 S.W.2d 4 (Tex.Cr.App. 1988); *Sawyers v. State*, 724 S.W.2d 24, 30 (Tex.Cr.App.1986); *Franklin v. State*, 693 S.W.2d 420, 424 (Tex.Cr.App.1985); *Hughes v. State*, 562 S.W.2d 857, 861 (Tex.Cr.App. 1978). See also *Briddle v. State*, 742 S.W. 2d 379 (Tex.Cr.App.1987); *Bodde v. State*, 568 S.W.2d 344, 349 (Tex.Cr.App.1978).

In three points of error appellant urges that the court abused its discretion in denying challenges for cause to veniremen Welch, Whittington and Evans. And he urges that because the challenges for cause were improperly overruled he was forced to exhaust his peremptory challenges and accept an objectionable juror which he specified. See *Wolfe v. State*, 147 Tex.Cr.R. 62, 178 S.W.2d 274 (1944); *Hernandez v. State*, 563 S.W.2d 947 (Tex.Cr. App.1978); *Holloway v. State*, 666 S.W.2d 104 (Tex.Cr.App.1984); *Turner v. State*, 671 S.W.2d 679 (Tex.App.–Dallas 1984).

■ At the conclusion of the voir dire examination of venireman Margaret Susan Welch the appellant challenged her for cause based on her answers to certain questions which would indicate the appellant would be "prejudiced."[1] The reasons for a challenge for cause are set forth in Article 35.16, V.A.C.C.P. While appellant did not cite one of the reasons to the trial court, he does state in his point of error that Welch was disqualified under Article 35.16(a)(9), supra, in that she had "a bias or prejudice in favor of or against the defendant."

Welch did testify that her husband had been a peace officer for 21 years, but added that he had retired before they had married, and that she didn't even know him when he was a peace officer. The fact that her husband was formerly in a law enforcement agency does not furnish a basis alone to sustain a challenge for cause. See *Green v. State*, 433 S.W.2d 435, 436 (Tex. Cr.App.1968). See also *France v. State*, 141 Tex.Cr.R. 246, 147 S.W.2d 1089, 1091 (1941); *Lugo v. State*, 136 Tex.Cr.R. 226, 124 S.W.2d 344, 346 (1938); *Esterline v. State*, 707 S.W.2d 171, 175 (Tex.App.–Corpus Christi 1986). When asked if she could be fair to the defendant in view of her husband's former background, she answered, "Yes, I could." She stated that law enforcement officers do not always tell the truth, they weren't always right, they did not always do the right thing in an investigation, and they committed crimes also.

Further, the record is devoid of any indication that Welch would disregard the court's admonishments and discuss the case with her husband if she was chosen as

---

1. Appellant's objection was as follows:
 "May it please the Court, I would like to challenge for cause based upon the following information she gave when she was asked questions of mine on the witness stand. One, she should be challenged because her husband is a retired peace officer. That she stated that her views had changed and she agreed with him substantially since she got to know him and they got married or something to this effect. That she supported one of the possible witnesses that may be called to testify in this case. She supported him in a political race. That she gave goods or drinks or so forth to people in uniform when they came into her store. That she immediately stated that she absolutely was in favor of the death penalty in a manner that would indicate that she had a strong, exceptionally strong favor toward the death panalty (sic). The next number, that her home was burglarized and the fact that her husband said that he could figure it out immediately who was involved and acted thereon. Further, that along with this attitude that she exhibited, interrogation, that being on this jury would cause unquestioned conversation in the solitude and privacy of their home. To involve some conversation regardless of any admonishments on the part of this Court as to explanations or suggestions involved in this case. I think that would be an impossible set of circumstances for this Court to ever supervise or regulate. And her attitude while being interrogated so fervantly (sic) strong indicates a favoritism toward the prosecution to the point where this defendant would be prejudiced. I believe that is it."

a juror. There is no merit to appellant's claim in this regard.

Welch did indicate that she had supported a potential officer-witness, Frank Falcone, in his race for Justice of the Peace in 1984, that she put his placard in a window and that she worked at the polls for him, passing out cards. She related it would not embarrass her if he testified as "he could tell the truth or lie just like anybody else can." She had no opinion as to whether he would be inclined to tell the truth or to lie because she didn't know the man "that well." [2] She indicated she could judge the credibility of a police officer just like any other witness setting aside the fact he was a police officer.

She acknowledged that in the store she operated she gave free coffee and cold drinks to uniformed officers when they stopped there, explaining that it was merely the continuation of a policy of the previous owners.

When asked by the court if she had any conscientious scruples or opposition to the death penalty, Welch did answer "absolutely not." To the prosecutor's question she answered, "I have nothing, nothing against the death penalty whatsoever." Based on this alone appellant complained she had an "exceptionally strong favor toward the death penalty." There was no showing she could not consider the full range of punishment in accordance with the court's charge. She indicated the death penalty was only appropriate if the circumstances warranted it, that the death penalty should not be automatically given in a murder case, that she was no more inclined towards the death penalty than most people, that if the evidence did not support a verdict of guilty in a capital murder case she would vote "not guilty," that such finding would not bother her at all, that she could be "completely fair to this defendant," and that she could follow the court's charge as to burden of proof, presumption of innocence, that an indictment is no evidence of guilt, that the defendant did not have to testify, etc.

Welch expressed no prejudice against the appellant.

Welch did indicate that her house had been burglarized and her husband had figured out who committed the offense, but appellant fails to point out how this forms any conceivable basis for a challenge for cause on the basis of Article 35.16(a)(9), supra.

 The rulings on a challenge for cause to a prospective juror are a function of the trial court. When bias or prejudice is not established as a matter of law, the trial court has discretion to determine whether bias or prejudice actually exists to such degree that a prospective juror is disqualified and that the challenge for cause should be sustained. *Anderson v. State,* 633 S.W.2d 851 (Tex.Cr.App.1982). When a prospective juror is known to be biased or prejudiced as a matter of law, he must be excused when challenged, even if he states he can set aside the bias or prejudice and provide a fair trial. *Williams v. State,* 565 S.W.2d 63 (Tex.Cr.App.1978); *Clark v. State,* 717 S.W.2d 910, 917 (Tex.Cr.App. 1986). The ruling of the trial court should not be overturned unless, in light of the entire voir dire examination of the prospective juror, bias or prejudice has been established as a matter of law. *Anderson,* at 854. See also *Faulder v. State,* 745 S.W.2d 327 (Tex.Cr.App.1987); *Cordova v. State,* 733 S.W.2d 175 (Tex.Cr.App.1987); *Mays v. State,* 726 S.W.2d 937 (Tex.Cr.App.1986).

After examining the entire voir dire examination of Welch we conclude that no prejudice as a matter of law was established, and the court did not abuse its discretion in denying the challenge for cause.

Next appellant contends the court abused its discretion in denying his challenge for cause to venireman Mrs. B.H. (Nell) Whittington, Jr., under Article 35.-16(a)(9), and (c)(2), V.A.C.C.P.

At the conclusion of the voir dire examination of Whittington the appellant chal-

---

**2.** "The mere fact that a juror knows a witness and is on friendly relations with him is not a sufficient basis for disqualification." *Anderson v. State,* 633 S.W.2d 851, 853 (Tex.Cr.App.1982).

lenged her for cause (as set out below).[3] The challenge was denied.

As to the challenge under Article 35.-16(a)(9), supra, we observe that appellant contends Whittington was biased and prejudiced because of a close and continuing association with law enforcement agencies and personnel. Whittington testified that from 1978 to 1980 she worked in the Liberty County Sheriff's office, mostly as a dispatcher, that she knew many of the officers and other personnel, that from 1980 to the time of trial she had done volunteer work from time to time by assisting in the transportation of female prisoners, and that she owned a police scanner which she had used when a dispatcher to keep abreast of activities while off-duty so that she would be familiar with what had transpired when she went on duty. She continued to use the police scanner as a hobby after leaving the employment of the sheriff. She knew of both prosecutors and knew the wife of one with whom she had once worked, but stated this would not keep her from being a fair and impartial juror. She knew one of appellant's counsel and knew the other had represented her brother in a divorce suit.

Whittington indicated that she could judge the credibility of an officer-witness in the same manner as any other witness, that police officers could be mistaken, that she could give as much credence to a stranger's testimony as to someone she knew, that her association with law enforcement would not have any bearing on her ability to be a fair and impartial juror, and that she could be absolutely objective in the case.

She did indicate that she was very pro law enforcement, but she stated that would not interfere with her objectively listening to the evidence in a fair and impartial manner and following the court's charge. The court itself elicited from Whittington that she could follow the law as to burden of proof, presumption of innocence, the failure of a defendant to testify, etc. In response to questions of appellant's counsel, she stated she had seen charges filed "when there was nothing."

Without explanation appellant's counsel asked Whittington what she thought about the Fifth Amendment. She answered, "Understanding it's used a lot of time to when I don't think it should be." Reminding Whittington of the days of the late Senator McCarty and a proposal to repeal the Fifth Amendment, and that McCarty was investigating people accused of being members of the Communist Party or traitors, Whittington was asked, "And you would agree that the Fifth Amendment probably was an unjustifiable right for a defendant, would you not?" Whittington responded, "Yes." No challenge for cause was then made. Later the prosecutor explained to the prospective juror the Fifth

---

3. "MR. FRIEND: The defendant challenges for cause due to 35169—what is it—

"THE COURT: 3516 what?

"MR. FRIEND: Nine, due to bias and prejudice, because of the continuing close and continuing relationship with law enforcement agencies as well as personnel. Number two, she has a negative predisposition against criminal defendants and that, admittedly, she is pro law enforcement, which is all right, except for the fact that obviously a pro, admittedly pro law enforcement could not be a fair and impartial juror.

"Three, that a belief which is clear and well stated that the Fifth Amendment is not a proper right. Specifically, this is based on her statements, the fact that she worked for the sheriff's office for no pay and listens to a police scanner 24 hours a day.

"Further, it is out (sic) belief that she has more knowledge of this case than she admitted. Even upon the Court's questioning of this prospective juror she admitted openly and clearly that she felt that the Fifth Amendment was overused.

"Now, in addition to that, I would like to respectfully object to the Court's attempt to reconstruct this witness by saying, 'I am trying to find out, I need to know how you feel,' in a leading manner. I think that any change in her statement was probably done to some degree at that time.

"Nevertheless, I would like to renew the defendant's challenge for cause in this case on this prospective juror."

Just before this challenge for cause the State had accepted the prospective juror and the appellant had simply challenged for cause. The court briefly interrupted to admonish both counsel about a procedural matter. Appellant's counsel was then allowed to state the basis for his challenge for cause, hence his reference to renewing the challenge.

Amendment and the privilege against self-incrimination. Whittington stated she understood the law, that if a defendant did not testify that his silence could not be considered against him, and that she would follow the law and the court's charge in that connection. She stated that she thought that "sometimes it (Fifth Amendment) has been overused" but that as a "patriotic type person" she would go along with "the law of my land," and could follow the law in the judge's instructions.

Appellant also complained in his challenge for cause about the court's introductory remarks to certain questions asked by the court on voir dire examination. First, no objection was timely made when the questions were asked, and second, the same cannot afford a basis for a challenge for cause under the circumstances presented.

Further, appellant stated his belief that Whittington had more knowledge of the case than she admitted. He did not request further interrogation but stated it as "out (sic) belief." Whittington had not formed an opinion as to the guilt or innocence of the appellant, would not consider anything she had heard about he case, would presume the appellant to be innocent, and would hold the State to its burden of proof. She would base her verdict on what evidence was presented and nothing else. The prospective juror was not subject to challenge on the basis of the record before us. See and cf. *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985); *Adami v. State*, 524 S.W.2d 693, 700 (Tex.Cr.App. 1975); *Freeman v. State*, 556 S.W.2d 287 (Tex.Cr.App.1977); *Barefoot v. State*, 596 S.W.2d 875 (Tex.Cr.App.1980).

The most serious concern in appellant's multifarious challenge for cause is the Fifth Amendment question. However, in view of the rehabilitation of the prospective juror after an explanation of the Fifth Amendment, we find no abuse of discretion on the part of the trial court. See and cf. *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App. 1986); *Scott v. State*, 490 S.W.2d 578 (Tex. Cr.App.1973); *Guerra v. State*, 690 S.W.2d 901 (Tex.App.–San Antonio 1985).

■ We cannot conclude that bias or prejudice was established as a matter of law, *Anderson*, supra, and no abuse of discretion occurred when the trial court denied the challenge of cause to prospective juror Whittington.

Still further, appellant argues that the court abused its discretion in denying his challenge for cause to venireman Margaret Evans under Article 35.16(a)(9), and (c)(2).

Evans was the objectionable juror appellant pointed out he was forced to take when the court denied his challenges for cause to prospective jurors Welch and Whittington causing him to exhaust peremptory challenges.

At the conclusion of the voir dire examination Evans was herself challenged for cause as set out below.[4] The challenge was overruled.

4. "We challenge this prospective juror, Number 75, Margaret Evans, we challenge her for cause because she has a bias and a prejudice against the Defendant and some areas of the law upon which the Defendant will rely, thereby being disqualified under Article 35.-16(a)9 and 35.16(c)2 of the Texas Code of Criminal Procedure.

"In support of the challenge, during the examination by the prosecutor the prospective juror was given only two opportunities to articulate her views. Both times she expressed herself beyond a yes or no. The answers were unsatisfactory to the prosecutor and he promptly asked a closed in question containing words he wanted and then asked, quote, 'Would you agree with that?', question mark, end of quotation.

"Not only did she agree but her answers were in one case diametrically opposite to her first position and the other was probably qualified when her original response was not. We spoke of her answer as to requiring the State to prove premeditation, and to her answer stating, quote, 'That if a person takes a life he shouldn't be able to live', unquote.

"About 90 percent of all statements made by this prospective juror, statements made by the prosecutor to this prospective juror were not questions but ended statements, quote, 'Would you agree with that?', unquote. She would have said yes regardless of the statement. She did not ask about reasonable doubt until the very end of the interrogation by the prosecutor after he'd been over it several times.

"Futher (sic), we feel that she has too close a connection with the victim's family. And that she has made—she has more information about this case than admitted. She's admitted

First, appellant contends that Evans had such prior knowledge of the case she would have been biased against him at trial. Yet her knowledge was shown to be limited. She stated her daughter went to school with Sam Jones, the deceased's brother, and she learned from her daughter the deceased was found dead in her home, and a child, a two-year-old boy, was found crying, and had apparently been there since 3 a.m. with its dead mother. She had not heard who was arrested in connection with the case. Evans told the court "No" in answer to the court's inquiry whether the information she had learned had caused her to "form any opinion as to the guilt of any person in connection with the death of Marilyn Peter." When asked by appellant's counsel if she could erase that information from her mind if there was no testimony about the child she answered, "Probably not."

Later in answer to the prosecutor's question Evans answered that she would set aside any information she had heard and judge the facts only on evidence admitted, that she would have no difficulty with this. Later she made the same declaration in answer to the court's inquiry. She also stated she did not know the appellant and had no bias or prejudice against him. We cannot say the trial court abused its discretion in denying the challenge for cause on this basis. *Phillips v. State*, 701 S.W.2d 875, 882 (Tex.Cr.App.1985). See also *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App.1986); *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985).

Appellant also contends Evans had such a close relationship to the deceased's family she was biased against the appellant. Evans stated her daughter went to high school with Sam Jones, the victim's brother, but Evans did not know him "that well." She did not know the deceased or any other member of her family except Jones. She stated her limited "acquaintance" with Jones would not affect her ability to render a verdict according to the evidence.

The law requires more than the existence of a casual acquaintance with the victim of a crime or the victim's family to make a prospective juror subject to a challenge for cause. *Chambers v. State*, 568 S.W.2d 313, 323 (Tex.Cr.App.1978). See also *Williams v. State*, 682 S.W.2d 538, 542–543 (Tex.Cr.App.1984); *Anderson v. State*, 633 S.W.2d 851 (Tex.Cr.App.1982). There was no showing that Evans was a biased juror as a matter of law on the basis of a relationship to the deceased's family. The court did not abuse its discretion.

Evans, appellant claims, was biased against the Fifth Amendment, a law upon which he was entitled to rely. Article 35.16(c)(2), supra. Upon explanation of the privilege against self-incrimination, the right to remain silent, etc., by the prosecutor Evans agreed those matters were "good law." The record then reflects interrogation by appellant's counsel:

"Q ... Do you kind of feel that this defendant if he's charged with this, he really ought to get up and explain what happened in his view or where he was. Do you feel that?

"A Yes, sir."

The question and answer were isolated and were not related to any other interrogation on the same matter. Later in response to the prosecutor's inquiries Evans

---

that she's discussed it with the neighbors at the time. She also—that she could not put out of her mind the facts of the case she admitted knowing.

"She also expressed a belief that the Defendant should explain himself, which is, of course, a denial of his Fifth Amendment rights. This was her real feeling. Of course, upon re-examination by the State, she agreed with the prosecution. I don't really think that that represented her true feelings, whereas the questions that I propounded to her directly were.

"The last point is that she stated that she would be affected by blood and guts evidence and that this would inflame her mind. Now, I think that's pretty basic. Although I think when she is asked leading questions both by the prosecutor and the Court and she said yes to each. I don't know of anything she took issue with. But on direct questions, she said what her real feelings were. And we challenge this prospective juror for cause."

stated you would not require the appellant to testify, would not use his silence as any indication of his guilt, could follow the law in this respect and the court's instructions thereon. There was no showing Evans was biased against the Fifth Amendment. The court did not abuse its discretion in denying the challenge for cause on this basis. See *Bell, supra; Scott, supra.*

Appellant also contends that Evans' statement that "If a person takes a life he would have no right ... to ... live his life out...." revealed a feeling on the death penalty so strong that she could not follow the law as a juror. Appellant relies on the following interrogation by the prosecutor:

"Q Mrs. Evans, can you tell me, if you would, what are your feelings about the death penalty as punishment for certain crimes?

"A How do I feel about it?

"Q Yes, ma'am.

"A I feel a person should be punished for what he does. If a person takes a life he would have no right or opportunity to go ahead and live his life out, then they have to pay, you can just go around doing things—

"Q Fine.

"A I mean, he can't go around doing things like that, so something has got to stop somewhere.

Q Very well. So you agree with the death penalty, do you not.

"A Yes.

"Q ... as punishment for certain crimes.

"A Yes, sir.

"Q ... is that correct? Perhaps not all crimes, but certain crimes enumerated by our law, you agree with the death penalty?

"A Certain crimes, yes."

Prior to this interrogation Evans had stated she could follow the law and apply it, including the entire range of possible punishments. Evans was not properly challengeable for cause on the basis of appellant's contention.

In his challenge for cause appellant stated, "The last point is that she stated that she would be affected by blood and guts evidence and that this would inflame her mind." After establishing Evans was not a nurse, appellant's counsel interrogated as follows:

"Q Does blood and guts bother you?

"A Yes, sir.

"Q The fact that they might have pictures and so forth, would that cause you to think a little differently than you would or cause you not to be able to keep a clear head in regard to being fair and impartial?

"A I really don't know.

"Q Do you think that—you have a question in your mind about that? In other words, this might influence your mind is what I'm trying to say.

"A It probably would not.

"Q You think it would?

"A It probably would.

"Q Of course, you don't know yet because you haven't seen it—you haven't seen anything yet?

"A No, sir.

"Q But you think in all honesty it would inflame your mind, and probably cause you to maybe feel differently about something than you would without it, is that right?

"A Yes, sir."

Later in response to the prosecutor's questions Evans agreed that even though some evidence may be unpleasant she could still objectively judge the facts in the case, that simply because there was unpleasant evidence she would not find a defendant guilty automatically, that she would require the State to meet its burden of proof beyond a reasonable doubt, and that if the State didn't meet its burden she would find a defendant not guilty. Appellant recognizes the rehabilitation efforts of the prosecution, but asks this Court to ignore that part of the examination because of the "closed in questions" ending "Would you agree with that?" Appellant cites no authority to support his claim that the challenge for cause should be sustained on this basis under the circumstances. We find no merit to appellant's point of error.

In another point of error appellant urges that the "circumstantial evidence was insufficient to prove that appellant was in the course of committing and attempting to commit the offense of aggravated sexual assault, because the evidence supports a reasonable inference other than appellant's guilt."

Appellant concedes there was direct evidence that he stabbed Marilyn Peter, thereby causing her death, but "only circumstantial evidence" that appellant was committing and attempting to commit aggravated sexual assault, as the indictment alleged, and as the charge required the jury to find.

Appellant points to the balance of his extrajudicial confession which he had introduced after the State had offered an edited portion of his statement. In the part of the statement offered by the appellant he stated that he had gone to the deceased's home on the night or morning of the date of the alleged offense; that she had invited him into the house and offered to smoke a joint of marihuana with him; that they had engaged in both vaginal and anal intercourse with her consent; that later they argued about the deceased's refusal to "turn me onto some weed;"[5] that the deceased came at him with a butcher knife; and that he took the knife away from her and used it to repel her repeated attacks upon him. On the way home he threw the knife off a bridge into the water.

He also points to the testimony on cross-examination of Dr. Aurelio A. Espinola, Harris County Deputy Medical Examiner, that there was a possibility that the injuries to the deceased's vagina and rectum could have resulted from consensual intercourse, although the doctor's opinion was that there had not been consensual intercourse in view of the injuries, etc.

As the appellant acknowledges, the State offered evidence that on several occasions he had expressed a sexual desire for the deceased, and that at the time in question appellant was high on alcohol and marihuana. Appellant's confession as to the killing of the deceased was introduced by the State.

There was evidence offered as to the condition of the deceased's house which clearly indicated quite a struggle took place. There was blood all over the living room and kitchen and on a space heater and on a high chair which was broken. Other evidence indicated this was not the condition of the house an hour or so before the alleged offense. Dr. Espinola, who conducted the autopsy on the deceased, testified she died from five stab wounds in the chest, that she had been choked, that there were other lacerations, wounds, and bruises, and that a mark on the deceased's neck could have been from contact with the high chair. He related that the injuries to the arms probably occurred when the deceased raised her arms to protect her vital organs from an attack with a knife, and that the injuries to the legs probably occurred when the deceased was resisting a sexual attack and was stabbed in the legs to make her open them so that sexual intercourse could take place. The wounds were all defensive in nature in his opinion. The doctor stated that there had been forceful vaginal and anal intercourse; that sperm was found in the anal canal; that bruises inside the vagina were caused by bleeding inside the mucosa due to the infliction of trauma by a blunt object such as an erect penis; and that injuries to the anus were also indicative of the use of force during anal intercourse. It was his expert medical opinion, based on reasonable medical and scientific certainty, that a sexual assault had taken place. This testimony directly contradicted appellant's version in his written statement that the intercourses took place with consent. Dr. Espinola did relate that the injuries to the vagina and anus could possibly have occurred during consensual intercourse; that, however, was not his opinion as to what occurred.

5. There was defensive testimony offered that the appellant and two women had gone to the deceased's house at 9:30 p.m., hours before the alleged offense, and had purchased marihuana from the deceased. The deceased's husband was working on an oil rig in the Gulf of Mexico at the time of the alleged offense, but he admitted that marihuana was sold from his home.

In *Alexander v. State*, 740 S.W.2d 749, 757–758 (Tex.Cr.App.1987), this Court wrote:

"The standard for reviewing the sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases. *Fierro v. State*, 706 S.W.2d 310, 313 (Tex.Cr.App.1986); *Anderson v. State*, 701 S.W.2d 868, 872 (Tex.Cr.App. 1985); *Brandley v. State*, 691 S.W.2d 699, 703 (Tex.Cr.App.1985); *Garrett v. State*, 682 S.W.2d 301, 304 (Tex.Cr.App. 1984); *Carlsen v. State*, 654 S.W.2d 444, 449 (Tex.Cr.App.1983) (Opinion on Rehearing). The evidence must be viewed in the light most favorable to the verdict, and the standard is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Fierro*, supra; *Brandley*, supra; *Jackson v. State*, 672 S.W.2d 801, 803 (Tex.Cr.App.1984); *Jayroe v. State*, 707 S.W.2d 652, 653 (Tex.App.—Texarkana 1986, PDR refused); *Hamilton v. State*, 699 S.W.2d 576, 577 (Tex.App.—Texarkana 1985, PDR refused). "If the State's evidence supports an inference other than a finding of the essential elements of the crime, then no trier of fact could *rationally* find the accused guilty *beyond a reasonable doubt*—and this is true irrespective of the character of the evidence." *Carlsen*, supra, at 449–50.

"Appellant contends that a conviction on circumstantial evidence cannot be sustained unless the circumstances exclude to a moral certainty every other reasonable hypothesis except the guilt of the accused. (Emphasis supplied.) However, this Court has also held:

" 'It is not required that the circumstances should, to a moral certainty, actually exclude every hypothesis that the act may have been committed by another person, but that the hypothesis is a reasonable one consistent with the circumstances and the facts proved. (Citations omitted) Each fact need not point directly and independently to the guilt of the accused, as the cumulative effect of all the incriminating facts may be sufficient to support the evidence. (Citations omitted) However, proof which amounts only to a strong suspicion or mere probability is insufficient.' (Citations omitted) *Carlsen v. State*, 654 S.W.2d 444, 447 (Tex.Cr.App.1983).

See also *Brandley*, supra; *Moore v. State*, 640 S.W.2d 300, 302 (Tex.Cr.App. 1982); *Autry v. State*, 626 S.W.2d 758, 761 (Tex.Cr.App.1982); *Swink v. State*, 617 S.W.2d 203, 207 (Tex.Cr.App.1981), cert. denied, 454 U.S. 1087, 102 S.Ct. 648, 70 L.Ed.2d 624 (1981); *Schershel v. State*, 575 S.W.2d 548, 550 (Tex.Cr.App. 1979); *Stogsdill v. State*, 552 S.W.2d 481, 486 (Tex.Cr.App.1977); *Flores v. State*, 551 S.W.2d 364, 367 (Tex.Cr.App.1977); *Marmon v. State*, 704 S.W.2d 90, 92 (Tex.App.—Dallas 1985, PDR refused). "It is enough if the conclusion [of guilt] is warranted by the combined and cumulative force of all the incriminating circumstances." *Russell v. State*, 665 S.W. 2d 771, 776 (Tex.Cr.App.1983), cert. denied, 465 U.S. 1073, 104 S.Ct. 1428, 79 L.Ed.2d 752 (1984); see also *O'Pry v. State*, 642 S.W.2d 748, 760 (Tex.Cr.App. 1982) (Opinion on Rehearing); *Flores*, supra, at 367; *Jones v. State*, 442 S.W.2d 698 (Tex.Cr.App.1969), cert. denied, 397 U.S. 958, 90 S.Ct. 967, 25 L.Ed.2d 143 (1970)."

In *Anderson v. State*, 701 S.W.2d 868, 872–873 (Tex.Cr.App.1985), this Court wrote:

"Appellant also alleges that the evidence is insufficient since it supports a drug transaction as well as a robbery which thereby establishes a hypothesis other than that of appellant's guilt. Appellant confuses the standard for review in a circumstantial evidence case with the manner of its application. An alternate hypothesis of guilt is not a standard by which evidence sufficiency is measured: it is a 'guideline for assaying whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *Carlsen*, supra, at 450. Thus, simply because appellant presented a different version of the

events, the evidence is not rendered insufficient.

"Moreover, the jury was the ultimate trier of fact. As such, it had the duty of resolving conflicting testimony and the option of accepting or rejecting appellant's evidence. Simply because the jury found appellant's evidence unconvincing is not grounds for finding insufficient evidence to support the verdict. We find that there was sufficient evidence to support a rational trier of fact's finding that the State had proved the essential elements of the offense."

In the instant case there was sufficient evidence to show that appellant murdered the deceased Marilyn Peter. In evidence he offered, appellant admitted he had anal and vaginal intercourse with the deceased. He claimed it was with consent. The State offered circumstantial evidence to the contrary which appellant urges was insufficient to sustain the allegations as to capital murder. We disagree. The evidence was sufficient to show that the murder was committed as alleged while the appellant "was then and there in the course of committing and attempting to commit the offense of Aggravated Sexual Assault on the person of Marilyn Peter." See and cf. *Alexander v. State*, 740 S.W.2d 749, 795, 760 (Tex.Cr.App.1987); *Lincecum v. State*, 736 S.W.2d 673 (Tex.Cr.App.1987).

■ We conclude that a rational trier of the facts could have found all essential elements of the offense beyond a reasonable doubt viewing the evidence in the light most favorable to the verdict.

The eighth point of error is overruled.

In his ninth point of error appellant contends the "court erred in admitting appellant's statement and other evidence obtained as a result of an unlawful search and seizure.

■ First, we shall begin with the "other evidence" portion of the point of error. Appellant fails to mention just what "other evidence" he has reference to. We are not directed to any portion of the record where the undescribed "other evidence" was admitted into evidence nor to any objection

that the "other evidence" was a product of any unlawful search and seizure as now urged on appeal. In any event, it is clear that a failure to object in a timely and specific manner during trial will waive error in the admission of evidence. *Crocker v. State*, 573 S.W.2d 190 (Tex.Cr.App.1978). See also *Burdine v. State*, 719 S.W.2d 309, 319 (Tex.Cr.App.1986); *Goodman v. State*, 701 S.W.2d 850, 864 (Tex.Cr.App.1985); *Fancher v. State*, 659 S.W.2d 836, 839 (Tex.Cr.App.1983); *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980); *Granviel v. State*, 552 S.W.2d 107 (Tex.Cr.App.1976), cert. denied 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 250 (1977); *Bouchillon v. State*, 540 S.W.2d 319 (Tex.Cr.App.1976); *Salas v. State*, 486 S.W.2d 956 (Tex.Cr.App.1972); *Valdez v. State*, 472 S.W.2d 754 (Tex.Cr.App.1971); *Hinkle v. State*, 442 S.W.2d 728 (Tex.Cr.App.1971); *Cedillo v. State*, 165 Tex.Cr.R. 371, 307 S.W.2d 267 (1957). Further, this is true even though the error may concern a constitutional right of the defendant. See *Gauldin v. State*, 683 S.W.2d 411, 413 (Tex.Cr.App.1984); *Russell v. State*, 665 S.W.2d 771, 777–778 (Tex.Cr.App.1983); *Watkins v. State*, 572 S.W.2d 339 (Tex.Cr.App.1978); *Shannon v. State*, 567 S.W.2d 510 (Tex.Cr.App.1978); *Hovila v. State*, 562 S.W.2d 243 (Tex.Cr.App.1978); *Mendoza v. State*, 552 S.W.2d 444 (Tex.Cr.App.1977).

■ In his brief appellant mentions, in passing, that while in jail a Texas Ranger "took appellant's handprints several times. There was no testimony as to why this was done nor that any warnings were given." Whether this was part of the "other evidence" is not clear, but when testimony was given that the bloody print on the deceased's door matched appellant's known prints there was no objection offered. Macrame owls, a jack-in-the-box toy, and a knife were all admitted without objection. Further, there was evidence of three voluntary consents to search, given by appellant on December 6, 10 and 12, 1983. There being no timely objection, nothing is presented for review as to the undescribed "other evidence."

Next, we turn to the appellant's contention that his statement was obtained "as a result of an unlawful search and seizure." Here again appellant fails to call our attention to any portion of the record where he objected to the admission of his statement on the basis on which he now advances on appeal. In order to complain on appeal about the admissibility of a confession there must have been an objection thereon in the trial court, and the objection must have called the attention of the trial court to the particular complaint raised on appeal. *Fancher v. State*, 659 S.W.2d 836 (Tex.Cr.App.1983). It has been held that a trial objection to the voluntariness of a confession and non-waiver of rights under *Miranda*[6] and Article 38.22, V.A.C.C.P., does not permit a defendant to complain on appeal for the first time that the confession was the product of an illegal arrest and detention. The point of error in such a situation does not comport with the trial objection and nothing is presented for review. *Fancher v. State*, supra. Still further, a defense trial objection that a confession was obtained as a result of an illegal custodial interrogation does not allow a defendant to complain on appeal that the statement was obtained as a result of an illegal search in violation of the defendant's Fourth Amendment rights, as no opportunity was presented for the trial court to rule.[7] Thus, nothing was presented for review. *Salas v. State*, 486 S.W.2d 956 (Tex.Cr.App.1972). As earlier noted, a failure to object can even waive an error involving constitutional rights and the rule that the error presented on appeal must be the same objection raised at trial applies with equal force to constitutional violations. *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983); *Gauldin v. State*, 683 S.W.2d 411 (Tex.Cr.App.1984).

In his written motion to suppress the confession appellant urged that he was under arrest at the time, that he was coerced and enticed, that he did not waive his right to counsel and was deprived of such right, and that the statement was involuntary and in violation of his "rights under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. Article 1, § 10 of the Texas Constitution; and Articles 1.05 and 38.23, V.A.C.C.P." There was no express mention of any violation of appellant's rights under the Fourth Amendment or Article I, § 9, Texas Constitution.

In his findings of fact and conclusions of law filed after the hearing on the motion to suppress, the trial court found that appellant was legally arrested in the Old Snake River Subdivision, that he had been given his *Miranda*[8] and Article 38.22, V.A.C.C.P., warnings at the scene of the arrest, and again upon arrival at the Liberty County Jail, and again during the interview leading to the confession, that he understood his rights and never indicated a desire for an attorney, that no force, coercion, etc., was used, that the confession was freely and voluntarily given, and that while the appellant was not taken before a magistrate until sometime after the confession was given there was no causal connection between the failure to take the appellant before a magistrate and the giving of the confession.

As earlier noted, appellant has not directed our attention to any place in the record where he timely and specifically objected upon the basis that the confession resulted from an illegal search and seizure as now claimed on appeal.

Appellant now relies upon the testimony that between 5 and 6 a.m. on December 6, 1983, some three days after the alleged offense that police officers from Liberty and Polk Counties, including the Liberty County Deputy Sheriff Robert Dunn, under the direction of Texas Ranger Tom Walker, were making a "sweep" of the Old Snake River Subdivision looking for a man named

6. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

7. The purposes of an objection are: first, a specific objection is required to inform the trial judge of the basis of the objection and afford the judge an opportunity to rule on it; and second, a specific objection is required to afford opposing counsel an opportunity to remove the objection or supply other testimony. *Thomas v. State*, 723 S.W.2d 696 (Tex.Cr.App.1986).

8. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Scoggins for whom they had an arrest warrant or warrants. They were assisted by a member of the Crime Watch for the subdivision who was pointing out abandoned or deserted houses. Dunn clearly indicated the "sweep" had nothing to do with the investigation into the alleged offense. At the time another man had been arrested and had given a confession to the Peter murder.[9]

It appears that the house in question was pointed out as being deserted. Officers entered the house and found appellant. Appellant claims the house belonged to his parents and that he was living there, and that at first he was taken outside nude into the freezing weather. When Officer Dunn arrived appellant was outside and dressed. Dunn at the time thought they might have apprehended Scoggins. Appellant gave him a name and birth date which when checked proved to be false. When confronted with this information appellant gave his correct name. When this information was checked it was revealed that there was an outstanding warrant from Harris County for revocation of probation in a felony case. Appellant was so informed and was formally arrested by virtue of such warrant. It appears that appellant may also have volunteered the information he was wanted in Harris County. The confession was taken several hours later.

■ We do not understand appellant to take issue with the fact of a valid outstanding felony warrant from Harris County.[10] Appellant appears to argue that the initial entry into his house and his detention until his formal arrest under the Harris County warrant was illegal, and that the confession was thus obtained as a result of this search and seizure in violation of the Fourth Amendment and Article I, § 9, Texas Constitution. Since we have found no objection on this basis in the trial court, nothing is presented for review on appeal. *Fancher v. State*, supra; *McKay v. State*, 707 S.W.2d 23 (Tex.Cr.App.1985).

If it can be argued that there was a timely objection on this basis, no reversible error is presented.

In *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), the defendant was illegally arrested and taken to a police station where, after being given the *Miranda* warnings, he made incriminating statements concerning a murder for which he was subsequently convicted. The United States Supreme Court held that the *Miranda* warnings alone were insufficient to attenuate the taint of an arrest in violation of the Fourth Amendment. The court was careful to differentiate between the *Miranda* warnings which are a procedural safeguard employed to protect Fifth Amendment rights against the compulsion inherent in custodial surroundings, and the exclusionary rule as utilized to effectuate the interests of the Fourth Amendment. In *Brown*, the Court wrote:

"Thus, even if the statements in this case were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken *Wong Sun* [v. U.S., 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)] requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' [371 U.S. 471 at 486, 83 S.Ct. 407 at 416, 9 L.Ed.2d 441]. *Wong Sun* thus mandates consideration of a statement's admissibility in light of the distinct policies and interest of the Fourth Amendment."

■ In determining whether a confession given following an illegal arrest is sufficiently attenuated to permit the use of the confession at trial the Supreme Court identified the following factors to be considered in making this determination:

(1) whether *Miranda* warnings were given;

(2) the temporal proximity of the arrest and the confession;

---

9. It was later shown that this man had mental problems and the charges were dismissed.

10. See and cf. *Townsley v. State*, 652 S.W.2d 791 (Tex.Cr.App.1983) (footnote # 2).

(3) the presence of intervening circumstances; and

(4) The purpose and flagrancy of the official misconduct.

*Brown v. Illinois,* supra; *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Taylor v. Alabama,* 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982). See also *Green v. State,* 615 S.W.2d 700 (Tex.Cr.App.1980), cert. den. 454 U.S. 952, 102 S.Ct. 490, 70 L.Ed.2d 258 (1981); *Bell v. State,* 724 S.W.2d 780 (Tex.Cr.App.1986); *Self v. State,* 709 S.W.2d 662 (Tex.Cr.App.1986).

In the instant case appellant was given the *Miranda* warnings three times prior to the giving of the confession. It was not challenged that appellant understood his rights, did not invoke them, and waived them. In *Brown* it was held that *Miranda* warnings were insufficient standing alone to attenuate the taint of an arrest in violation of the Fourth Amendment. *Brown* made clear, however, that *Miranda* warnings are an important factor in determining whether the confession was obtained by exploitation of an illegal arrest. 422 U.S. at 603, 95 S.Ct. at 2261. See also *Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 2666, 73 L.Ed.2d 314, 319 (1982); *Self,* supra, at 666.

The second factor to be considered is the temporal proximity of the arrest and the confession which Justice Stevens concluded may be an ambiguous factor in his concurring opinion in *Dunaway,* supra, 442 U.S. at 218, 99 S.Ct. at 2266. In *Bell,* supra, this Court only recently wrote: "The second element ... is generally not a strong determining factor per se...." The State estimates the time lapse as between five and eight hours while appellant urges it was seven hours. The time falls on the State's side of the ledger on the question of taint under the circumstances.

With regard to the third factor of the *Brown* test, we observe that there was a formal arrest on a valid charge shortly after the claimed illegal arrest and detention, transforming it into a legal arrest, *Townsley,* supra, and constituting the presence of intervening circumstances. Further, it is well established that failure to take an accused before a magistrate does not in itself invalidate a confession unless such failure, in some manner, causes or contributes to bringing about the confession. *Goleman v. State,* 247 S.W.2d 119 (Tex.Cr.App.1952); *Cobbs v. State,* 495 S.W.2d 900 (Tex.Cr.App.1973); *Myre v. State,* 545 S.W.2d 820 (Tex.Cr.App.1977); *Waller v. State,* 648 S.W.2d 308 (Tex.Cr.App.1982). See also *Self,* supra, at 666–667.

The fourth factor is the purpose and flagrancy of the official misconduct. Here the officers were not investigating the instant offense. Another man had already confessed to the crime. The officers from Liberty and Polk Counties were making a sweep of the subdivision looking for a man named Scoggins for whom they had a warrant out of Polk County and who was wanted in Angelina County. They entered a house which had been pointed out to them as being deserted or abandoned in their search for Scoggins. They found appellant, whom they believed to be Scoggins at first. After discovering appellant's true name and learning there was an outstanding felony warrant for him, he was formally arrested on the Harris County charge. The officers had no search warrant and did not know at the time of the Harris County arrest warrant, and should not have entered the house where appellant lived with no more information about the house being abandoned than was furnished by the "head" of the local Crime Watch. The instant case, however, is a far cry from the fact situations in *Brown, Dunaway, Taylor* and our case of *Green,* supra.

Without reiterating the facts of the instant case, the detention here had no "quality of purposefulness." It was not an "expedition for evidence" admittedly undertaken "in the hope that something might turn up." *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262. The conduct of the officers could not have been in full compliance with law and should not be condoned, but such conduct did not rise to purposeful and flagrant conduct given the circumstances of the case. See *Self,* supra, at 668. The fourth

factor is also on the State's side of the ledger.

 The confession was admissible under the *Brown* test even if there was an objection on Fourth Amendment and Article I, § 9, Texas Constitution grounds. The same would be true as to the undescribed "other evidence" if obtained by searches following voluntary consents to search after the initial detention. See *Miller v. State,* 736 S.W.2d 643, 649–651 (Tex. Cr.App.1987). The ninth point of error is overruled.

The judgment is affirmed.

CLINTON, J., concurs.

TEAGUE, J., dissents to the disposition of the point of error involving prospective juror Patricia Berrote.