Sonia CACY, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–93–00085–CR.

Court of Appeals of Texas, El Paso.

May 11, 1995.

Discretionary Review Refused Sept. 13, 1995.

Robert V. Garcia, Jr., Odessa, for appellant.

Albert G. Valadez, Dist. Atty., Fort Stockton, for State/appellee.

Before BARAJAS, C.J., and KOEHLER and LARSON, JJ.

## OPINION

BARAJAS, Chief Justice.

We withdraw our opinion and judgment of March 9, 1995, and substitute the following therefor.

Sonia Cacy appeals her conviction for the offense of murder. On April 16, 1992, a Pecos County grand jury indicted Appellant for the murder of William R. Richardson. On February 26, 1993, a jury found Appellant guilty and assessed punishment at 55 years' confinement in the Institutional Division of the Texas Department of Criminal Justice and a fine of $10,000, whereupon the trial court entered judgment in accordance with the jury's findings. We affirm the judgment of the trial court in part, reverse in part, and remand the cause for new sentencing proceedings.

### I. *SUMMARY OF THE EVIDENCE*

On October 1, 1991, Appellant moved into the Fort Stockton, Texas residence of Richardson, her uncle and stepfather. Sometime in October, a fire broke out on the back porch to the residence. Although both Appellant and Richardson knew of the fire, neither immediately reported it to the fire department. The record contains no evidence about the extent of the damage caused by this initial fire.

On November 2, 1991, at 3:18 a.m. the police and fire authorities responded to a second fire at the Richardson's home. The fire occurred in the room used by Richardson as his office and was extinguished by Fort Stockton Police Officer Armando Villesca with the use of a garden hose. Officer Villesca doused the fire through an open window that opened with a crank mechanism which could only be operated from inside the office. After the fire was extinguished, Fire Chief Jimmy Jackson investigated its cause and identified a box containing electrical equipment as the cause of the blaze. Jackson theorized that the box ignited adjacent curtains which fell from their brackets, thereby largely eliminating the blaze. Jackson initially suspected an intruder had set the fire but eliminated that hypothesis after finding the back door undisturbed and after seeing cash and firearms in plain view inside the office.

At 6:20 a.m. on the same date, authorities responded to a third fire at the Richardson home. Although more severe than the second fire, the third fire occurred in a detached garage building used as a storage room. Present that morning during the investigation of the third fire was Fire Marshall Frank Salvato, who took the opportunity to question Richardson about the second fire. Richardson told Salvato that he had attempted to extinguish it with a fire extinguisher that hung in the office. Salvato then confirmed that the office was coated with a white powder residue from materials commonly used in fire extinguishers.

The fourth and fatal fire occurred eight days later on November 10, 1991, at 6:15 a.m. Ms. Dois Clawson, Richardson's next door neighbor, was awakened by Appellant knocking at her door. She came to the door to see Appellant in the yard waving her hands, "walking in circles, and just not hollering, but making—not knowing what to do." Appellant informed Clawson that the house was on fire and that Richardson was inside. As the two approached the dwelling, Clawson could see flames through the living room window. Clawson then asked Appellant if fire fighters had been summoned and Appellant responded in the negative. Clawson returned to her

house to call the fire department, then returned to the blaze to see that Appellant had broken two window panes, from which escaped little smoke, in an apparent effort to enter the house. Because she was concerned the broken windows would better ventilate the fire and thereby intensify the blaze, Clawson pulled Appellant away from the windows.

Clawson next attempted to open the front door but found it locked. Upon inquiry, Appellant related that she had not escaped through the front door, but from her bedroom window. The two women walked to the open, crank-operated window to Appellant's room whereupon Appellant began to enter the room through the window. Before she was entirely beyond the plane of the window, however, Appellant abandoned her effort, citing difficulty breathing because of smoke. Clawson saw neither flames in the bedroom nor smoke coming through the window. Appellant told Clawson that Richardson woke her, informed her of the fire, instructed her to escape through the window, and indicated he would exit after fetching his dogs. Richardson's badly burned body was later discovered in the living room.

Clawson accompanied an emotionally upset Appellant to Clawson's house when Fort Stockton Police Officer Robert Curtis arrived. Appellant thereafter went back outside over Clawson's objections and attempts to restrain her. Officer Curtis, meanwhile, had kicked down the locked front door, allowing thick black smoke to escape through the opening and causing the flames to grow in size. As Officer Curtis tried to crawl through the door and under the smoke, Appellant attempted to crawl over him in an apparent effort to enter the house. Officer Curtis first pulled her away from the structure, then briefly struggled with Appellant to prevent her return to the building. Shortly thereafter, Officer Curtis repeated his actions, again pulling Appellant away from the house.

Soon thereafter, Officer Villesca and Fort Stockton Police Corporal Rick Carreon arrived on the scene. Officer Villesca immediately asked Appellant if anyone was in the house and she responded that someone was

in the living room. Officers Villesca and Carreon then made their way through thick smoke and intense heat to the living room, where they discovered a motionless body lying on the floor. They did not see the body at a distance and only discovered it by crawling along the floor and using a flashlight. Before they could rescue the body, however, the men were forced from the house by the smoke.

At some point, Appellant was placed in the backseat of a police vehicle in an effort to prevent her from endangering herself and others by entering the burning house. Although she was not suspected of wrongdoing at the time, she appeared angry to be confined to the car. After emerging from the burning house, Officer Villesca walked toward Appellant, whom Officer Curtis was restraining, in time to hear her shout, "let me go, you son of a bitch." Officer Villesca and Betsy Spencer, a Victim Assistance Coordinator, returned Appellant to Clawson's home. Appellant continued to try to leave the house, claiming that she wanted to see Richardson. As Officer Villesca took Appellant to Clawson's home, Appellant told him to let her loose, calling him a "mother fucker". Spencer later had to summon Officer Villesca back to Clawson's house to restrain Appellant, who again became belligerent, telling him, "you can kiss my ass," and repeating the above expletive. On this occasion, Officer Villesca noticed the strong odor of alcohol about Appellant. Spencer and Officer Carreon also smelled alcohol about Appellant. Further, Spencer noticed that some of Appellant's hair was singed, as though it had come into direct contact with flame. Spencer also noted that Appellant had black marks under her nose and about her lips.

As the fire was brought under control, Appellant was taken to the local hospital by Spencer and Clawson in Spencer's personal vehicle. While en route, Appellant repeated her story that Richardson had awakened her and instructed her to exit through her window. Some thirty minutes after arriving at the hospital, however, Appellant claimed she did not know if Richardson had actually done this or if Appellant only imagined the drama. Spencer, who had been instructed to have Appellant sedated, was contacted by Officer Carreon, via radio, and instructed not to have her sedated because investigators wished to obtain a statement from Appellant. Appellant overheard this conversation, which occurred on the way to the hospital and before Appellant mused that she may have imagined the events she earlier claimed to recall.

Medical personnel at the hospital confirmed others' observations that Appellant's hair was singed, that she had soot-like marks about her nose and lips, further, that she smelled of alcohol. When Officer Carreon arrived at the hospital in search of a statement from Appellant, he asked Spencer to be present while he spoke to Appellant. Appellant was quite clear that she was not "giving them a fucking thing" until she spoke to her attorney. While at the hospital, Officer Carreon for the first time observed scratches on Appellant's legs and blood around her toe, which observation he reported to his superiors. Sometime after 1:00 p.m., the District Attorney's office contacted Officer Carreon at the hospital and instructed him to seek a blood sample from Appellant. Appellant refused this request. At approximately 2:00 p.m. Appellant provided Spencer and Officer Carreon with a written statement. Between 7:00 p.m. and 9:00 p.m., an evidentiary search warrant was issued to obtain 10 ccs of blood and fingernail scrapings from Appellant. By the time Officer Carreon delivered the warrant to Appellant in her unguarded hospital room her fingernails had been bitten off down to the quick. Investigators nevertheless obtained the samples they sought without any resistance.

On the following day, fire investigators searched the burned house for evidence. They found in Appellant's bedroom a holographic will signed by B.R. Richardson, which named Appellant as sole heir.

## II. DISCUSSION

Appellant attacks her conviction in fifteen points of error. In Points of Error Nos. One and Two, Appellant challenges the sufficiency of the evidence to support the conclusion that the fire was of incendiary origin and that it was caused by Appellant. In Point of Error No. Three, Appellant challenges the suffi-

ciency of the evidence to support the conclusion that the deceased was Richardson. In Points of Error Nos. Four through Nine, Appellant complains of the admission into evidence of the invocation of her right to counsel, her right to refuse to consent to a search, the State's comment thereon, and of her trial lawyer's failure to object to such alleged comment. In Points of Error Nos. Ten and Eleven, Appellant complains of the alleged admission into evidence of the search warrant and of evidence of probable cause therefor. In her twelfth point of error, Appellant complains of the State's alleged comment on her failure to testify at trial.[1]

 In her third point of error, Appellant complains that the evidence was insufficient to allow a rational juror to conclude the deceased was William R. Richardson, whom the indictment accuses Appellant of murdering. In reviewing the sufficiency of the evidence, we are constrained to view the evidence in the light most favorable to the judgment to determine whether any rational trier of fact could find the essential elements of the offense, as alleged in the application paragraph of the charge to the jury, beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979); *Geesa v. State,* 820 S.W.2d 154, 159 (Tex.Crim.App.1991); *Butler v. State,* 769 S.W.2d 234, 239 (Tex.Crim.App. 1989); *Humason v. State,* 728 S.W.2d 363, 366 (Tex.Crim.App.1987). Our role is not to ascertain whether the evidence establishes guilt beyond a reasonable doubt. *Stoker v. State,* 788 S.W.2d 1, 6 (Tex.Crim.App.1989), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990); *Dwyer v. State,* 836 S.W.2d 700, 702 (Tex.App.—El Paso 1992, pet. ref'd). We do not resolve any conflict in fact, weigh any evidence, or evaluate the credibility of any witnesses, and thus, the fact-finding results of a criminal jury trial are given great deference. *See Adelman v. State,* 828 S.W.2d 418, 421 (Tex.Crim.App. 1992); *Matson v. State,* 819 S.W.2d 839, 843

(Tex.Crim.App.1991); *Leyva v. State,* 840 S.W.2d 757, 759 (Tex.App.—El Paso 1992, pet. ref'd); *Bennett v. State,* 831 S.W.2d 20, 22 (Tex.App.—El Paso 1992, no pet.). Instead, our only duty is to determine if both the explicit and implicit findings of the trier of fact are rational by viewing all the evidence admitted at trial in the light most favorable to the verdict. *Adelman v. State,* 828 S.W.2d at 421–22. In so doing, we resolve any inconsistencies in the evidence in favor of the verdict. *Matson v. State,* 819 S.W.2d at 843, quoting *Moreno v. State,* 755 S.W.2d 866, 867 (Tex.Crim.App.1988).

 The trial court's charge to the jury queried whether Appellant intentionally and knowingly caused the death of William R. Richardson. Appellant's complaint is that her uncle's name was Bill Roscoe Richardson and that he was never known as William R. Richardson. Appellant complains that the proof at trial established only that someone named "Mr. Bill Richardson" or "Bill R. Richardson" was killed. Appellant ignores the autopsy report produced after an examination of the deceased's body. The autopsy report identifies a tattoo on the left arm consisting of crossed cannons and a floral design surrounding the inscription "YMS–176." The record contains the testimony of Robert Charles Bux, the Deputy Chief Medical Examiner for Bexar County, who testified that he had seen Richardson's naval discharge papers and that they indicate he served on a vessel known as YMS–176. Further, Appellant never indicated anyone other than Richardson was in the house at the time of the fire, and only one body was recovered from the house after the fire. This evidence suffices to allow the jury to identify the deceased as Richardson.

The record also contains two reports from a person employed to assess the genuineness of the holographic will discovered after Richardson's death. These reports identified the deceased as "William (Bill) Roscoe RICH-

---

1. In her Points of Error Nos. Thirteenth through Fifteenth, Appellant complains of the trial court's affirmative finding that Appellant used a deadly weapon. The State concedes that these points are sound, flatly stating there is no record evidence to support such a finding and that it did not allege use of a deadly weapon. These claims are now moot, however, because a modified judgment that corrected the errors was entered after trial. Accordingly, we need not address them.

ARDSON" and as "William "Bill" Roscoe RICHARDSON." Appellant made no objection to the admission of these documents or the fashion in which they identified the deceased. The reports reflect the social reality that "Bill" is often used as a short or informal form of "William," which reality Appellant does not challenge. She argues, rather, the mere technical variance between the name of the deceased as alleged in the indictment and his name as proved at trial. Appellant carefully frames her complaint, however, not in terms of technical variance but in terms of the sufficiency of the evidence, which greatly constrains the scope of our review. Given the interchangeable use of several forms of Richardson's name, and given Appellant's failure to object to such use, we find the evidence sufficient to allow a rational juror to conclude that the deceased was William R. Richardson or, alternatively, that Appellant waived this issue by failing to object at trial. Accordingly, we overrule Point of Error No. Three.

■ In Points of Error Nos. Four through Nine, Appellant complains of the alleged admission into evidence of the invocation of her right to counsel, her right to refuse to consent to a search, the State's alleged comment thereon, and of her trial lawyer's failure to object to such alleged comment. Carreon testified at trial that he knew the fire was under investigation when he and Spencer sought, at the behest of an assistant fire chief, to elicit a written statement from Appellant. Carreon noticed blood on Appellant's hands and scratches on her legs when he entered her hospital room. The jury learned that Appellant told Carreon that "she wasn't giving [police] a fucking thing until she spoke [to] her attorney." Carreon testified that Appellant offered the same response when Spencer asked if they could photograph Appellant. Spencer echoed this testimony but recalled slightly less colorful language, testifying that she asked if Appellant would consent to giving a blood sample, to which Appellant responded, "Hell no, not without my attorney." Significantly, this request for a blood sample occurred after Carreon reported to the District Attorney's office that he observed blood on appellant and received instructions to attempt to obtain a

blood sample. After reporting Appellant's refusal to the District Attorney's office, Carreon was instructed to wait for a search warrant, which eventually issued for both a blood sample and fingernail scrapings.

The State seized on this drama during argument at the guilt/innocence stage of the trial, stating:

> So, the Defendant, now, is in the hospital and she refused to cooperate, no cooperation from her at all until a warrant to draw blood and to scrape the fingernails is brought back 12 hours later. The testimony from the experts was in 12 hours that alcohol can dissipate, be gone from the blood. So now it's okay for her to give a blood test. And of course the fingernail clippings test came out negative. There wasn't any fingernails left. What's she trying to hide at that point. No one's suspected, nobody's pointing the finger, nobody's accused her of anything. She knows the accusation is coming and she's just covering her bets.

■ Appellant's failure to object to the admission of the foregoing evidence waived any error it may have caused. In order for an issue to be preserved on appeal, there must be a timely objection that specifically states the legal basis for the objection. *Rezac v. State,* 782 S.W.2d 869, 870 (Tex.Crim. App.1990); *Little v. State,* 758 S.W.2d 551, 564 (Tex.Crim.App.1988), *cert. denied,* 488 U.S. 934, 109 S.Ct. 328, 102 L.Ed.2d 346 (1988); *Ortiz v. State,* 825 S.W.2d 537, 542 (Tex.App.—El Paso 1992, no pet.). Specific objections are required so that the trial judge has an opportunity to rule and opposing counsel has an opportunity to remove the objection or supply other testimony. *Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Crim. App.1977). An objection stating one legal basis may not be used to support a different legal theory on appeal. *Rezac v. State,* 782 S.W.2d at 870; *Little v. State,* 758 S.W.2d at 564. With the exception of the right of trial by jury, a defendant can waive any trial error, including constitutional error, by failing to properly object or request the proper relief. *Little v. State,* 758 S.W.2d at 563–64; *Thompson v. State,* 802 S.W.2d 840, 842 (Tex.

App.—Houston [14th Dist.] 1990, pet. ref'd); TEX.CODE CRIM.PROC.ANN. art. 1.14 (Vernon Supp.1995). Because Appellant failed to object to the admission into evidence of the invocation of her right to counsel, her refusal to consent to a search, and to the State's use of these matters at final argument, she has waived any error they may have caused.

■ Appellant largely acknowledges her waiver, but claims that the admission of the disputed evidence and the State's argument concerning it constituted fundamental error and are therefore reviewable. An exception to general waiver principles exists for fundamental error. See TEX.R.APP.P. 52(a); TEX. R.CRIM.EVID. 103(d); *Williams v. State,* 773 S.W.2d 525, 531 (Tex.Crim.App.1988) (jury argument), *cert. denied,* 493 U.S. 900, 110 S.Ct. 257, 107 L.Ed.2d 207 (1989); *Peoples v. State,* 874 S.W.2d 804, 807 (Tex.App.—Fort Worth 1994) (admission of testimonial evidence); *Francis v. State,* 801 S.W.2d 548, 551 (Tex.App.—Houston [14th Dist.] 1990) (admission of physical evidence). Examples of fundamental error include improper jury argument that, in light of the record as a whole, is extreme, manifestly improper, violative of a mandatory statute, or injects into the trial proceedings new facts harmful to the accused, *see Cooks v. State,* 844 S.W.2d 697, 727–28 (Tex.Crim.App.1992), *cert. denied,* — U.S. —, 113 S.Ct. 3048, 125

L.Ed.2d 732 (1993), and the admission of evidence that operates to render the defendant's trial fundamentally unfair, *see Briggs v. State,* 789 S.W.2d 918, 924 (Tex.Crim.App. 1990).

■ Appellant relies on *Powell v. State,* 660 S.W.2d 842, 845 (Tex.App.—El Paso 1983, no pet.), which holds that the State may not use the invocation of a defendant's right to counsel as evidence of her guilt. "To permit the use of such evidence," *Powell* reasons, "would erode the protections guaranteed by both state and federal constitutions." *Id.* *Powell* does not, however, purport to address whether use of the invocation of a constitutional protection as evidence of guilt constitutes fundamental error, and thus does not aid Appellant in her effort to circumvent her waiver. We conclude that the errors of which Appellant complains are not fundamental and that she has not otherwise established that her trial was so plagued by error that it was fundamentally unfair.[2] Accordingly, Points of Error Nos. Four through Seven are overruled. It remains only to examine whether Appellant's lawyer's failure to challenge the foregoing evidence denied Appellant the effective assistance of counsel as guaranteed by Article I, Section 10 of the Texas Constitution.

Appellant places her reliance solely on the Texas Constitution. Insofar as Appellant's

**2.** In its time, *Powell* was a relatively novel development, at least outside the context of the Fifth Amendment right not to testify against oneself, and various Courts of Appeals thereafter received *Powell* with considerable, if not altogether uniform, enthusiasm, *see Winn v. State,* 871 S.W.2d 756 (Tex.App.—Corpus Christi 1993, no pet.) (following *Powell* with respect to right to be free from unreasonable search); *Ex parte Owens,* 860 S.W.2d 727 (Tex.App.—Austin 1993, pet. ref'd) (agreeing with *Powell* rule with respect to right to be free from unreasonable search but refusing to find that prevailing professional norms require awareness of it), *cert. denied,* — U.S. —, 114 S.Ct. 2162, 128 L.Ed.2d 885 (1994); *Hardie v. State,* 787 S.W.2d 89 (Tex.App.—Dallas 1990) (following *Powell* with respect to right to counsel), *aff'd,* 807 S.W.2d 319 (Tex.Crim.App.1991); *Quesada v. State,* 751 S.W.2d 309 (Tex.App.—San Antonio 1988, no pet.) (noting *Powell* as "some authority" for principle that exercise of constitutional rights may not be used as evidence of guilt).

The Court of Criminal Appeals has since affirmed the correctness of *Powell*. *See Hardie v.*

*State,* 807 S.W.2d 319 (Tex.Crim.App.1991). In *Hardie,* the Court held that a defendant's invocation of her right to counsel may not be used as evidence of her guilt. *Id.* The Court went on to broaden *Powell* to constitutional rights generally, holding that the rule applies even to erroneously granted rights because it would be anomalous to tell a defendant that she has a right and then use her exercise of that right against her. *Id.* at 322.

Significantly, *Hardie,* like *Powell* before it, does not purport to address whether the admission or use of evidence of a defendant's exercise of a constitutional right constitutes fundamental error. Thus, our disposition of the issue raised by Appellant's fourth through seventh points of error attempts to neither broaden nor restrict those decisions, and we hold only that the particular errors of which Appellant complains are not fundamental. We note, however, that the Court of Criminal Appeals has held that a similar error, albeit one not claimed to be fundamental, could not be raised for the first time on appeal. *See Rezac v. State,* 782 S.W.2d at 871.

state constitutional right to effective assistance of counsel provides no greater protection than her right to effective assistance under the Sixth Amendment to the United States Constitution, we examine both state and federal law. *Hernandez v. State*, 726 S.W.2d 53 (Tex.Crim.App.1988).

 To successfully demonstrate the denial of effective assistance of counsel, Appellant must establish that her counsel's performance was deficient and that the deficiency was so serious that the defendant was deprived of a fair trial, meaning a trial whose result is reliable. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Wilkerson v. State*, 726 S.W.2d 542, 548 (Tex.Crim.App.1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987). The second prong of the above test requires that the errors have been so serious that Appellant was deprived of a fair trial, which we find if there exists a reasonable probability that the results would have been different but for counsel's unprofessional errors. A reasonable probability is one that is sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. at 694, 104 S.Ct. at 2068; *Wilkerson v. State*, 726 S.W.2d at 548 n. 3.

 Significantly, the constitutional right to counsel does not mean errorless representation. To meet the constitutional standard, counsel must provide only reasonably effective assistance. *Wilkerson v. State*, 726 S.W.2d at 548. In reviewing assertions of ineffective assistance, we examine the totality of the representation, neither focusing on isolated acts or omissions nor engaging in hindsighted comparisons of how other counsel might have tried the case. *Wilkerson v. State*, 726 S.W.2d at 548. A fair assessment of trial counsel's performance requires that we make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances at trial, and to evaluate the conduct from counsel's perspective at the time of trial. *Stafford v. State*, 813 S.W.2d 503, 506 (Tex.Crim.App.1991). Indeed, we indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and Appellant must overcome the presumption that the challenged action could be considered sound trial strategy under the circumstances at the time of trial. *Strickland v. Washington*, 466 U.S. at 688–89, 104 S.Ct. at 2064–65; *Stafford v. State*, 813 S.W.2d at 506. Finally, allegations of ineffective assistance must be firmly founded in the record. *Hawkins v. State*, 660 S.W.2d 65, 75 (Tex.Crim.App. 1983); *Mercado v. State*, 615 S.W.2d 225, 228 (Tex.Crim.App.1981).

 Appellant in her brief cites no authority to support her contention that her trial counsel's failure to object to evidence and argument at trial constituted ineffective assistance. Instead, she engages in a discussion that alleges error in conclusory terms, employing adjectives rather than reason. We nonetheless note that the record consists in part of an 11–volume statement of facts that chronicles trial proceedings which occurred over a five-day period. The record includes some 80 exhibits and the testimony of 26 witnesses. These facts reflect a lengthy, complex trial. Given the length of the trial and Appellant's failure to articulate a reasoned argument to support her ineffective assistance claim, we cannot say that her trial counsel's failure to object to the evidence and argument we earlier set out was unprofessional or not a plausible strategic decision. Neither can we say that the propositions that a defendant's invocation of her right to counsel and her refusal to consent to a search may not be used as evidence of her guilt are so well established in state or federal law or otherwise "so basic and fundamental ... as to compel the conclusion that any counsel who fails to perceive [them] is not functioning effectively as the counsel constitutionally guaranteed to a criminal defendant." *Ex parte Owens*, 860 S.W.2d 727 (Tex.App.—Austin 1993, pet. ref'd) (citations and internal quotations omitted), *cert. denied*, ── U.S. ──, 114 S.Ct. 2162, 128 L.Ed.2d 885 (1994). We conclude that the assistance provided by Appellant's lawyer neither undermined the outcome of the trial nor was it less than reasonably effective. Accordingly, we overrule Appellant's Points of Error Nos. Eight and Nine.

■ In Points of Error Nos. Ten and Eleven, Appellant complains that the trial court erred in admitting into evidence the search warrant and supporting affidavit to obtain blood and nail scrapings from Appellant and in permitting Officer Carreon to testify about those portions of the affidavit that constituted probable cause. The record does not establish that the warrant and affidavit were admitted into evidence, which admission is a logical predicate to Appellant's complaint. Although these documents appear in the record as exhibit 15, the trial judge expressly took the matter under advisement when it was offered at trial and never returned to the subject. Further, the court reporter's index of exhibits identifies exhibit 15 and its location in the record, but the index does not indicate that the exhibit was admitted into evidence. Absent some record evidence that the exhibit was admitted into evidence, we find that Appellant has failed to meet her burden to show that the exhibit's admission was error. Accordingly, Appellant's Point of Error No. Ten is overruled.

■ Appellant's complaint about Officer Carreon's testimony centers around the following exchange, which occurred after the State's attorney handed Officer Carreon exhibit 15:

Q. Okay. And does that search warrant also advise as to whether or not blood was found at the residence on that day? Read it if you need to.

. . . . .

A. Yes, sir, there was.

Q. Okay, so, was your information coupled from what you saw on this Defendant [sic] hands coupled with the information from any other officer at that residence?

A. Yes, sir, the Sergeant.

Appellant claims the exhibit and testimony relating to such exhibit were hearsay. Generally, hearsay evidence is not admissible before a jury if the issue of probable cause is not first raised. *Perez v. State,* 678 S.W.2d 85 (Tex.Crim.App.1984). If, however, the defense raises the issue, the door is opened for the State to introduce evidence to show probable cause, including hearsay evidence. *Ga-ston v. State,* 574 S.W.2d 120 (Tex.Crim.App. 1978).

Although Appellant never challenged probable cause at a suppression hearing, we find that she opened the door during cross-examination of Officer Carreon. Appellant's lawyer asked Officer Carreon why he sought a blood sample from Appellant. When Officer Carreon indicated his purpose was to determine the concentration of alcohol in her blood, Appellant's lawyer wryly asked if Officer Carreon intended to arrest her for driving while intoxicated. Appellant's lawyer then attempted to impeach Officer Carreon about the details of his alleged basis for securing a search warrant with the following:

Q. And did she resist when asked to give the blood samples or the nail scrapings?

A. No, she didn't.

Q. And this was the first time that she was asked or told about nail scrapings, right?

A. Yes, sir, it was.

Q. And that's when you noticed that her fingernails had either been bitten off or cut off down to the quick?

A. Yes, sir.

Q. You hadn't noticed that at 12:00 [sic] o'clock, had you?

A. No, sir, I didn't.

Q. So, that wasn't the basis for getting these warrants, was it?

A. No, sir, it wasn't.

Q. But you testified earlier that it was, were you just confused?

A. No, sir, I didn't testify to that.

The foregoing both challenged the sufficiency of the reasons that Officer Carreon said caused him to seek a warrant and questioned his veracity in citing those reasons. We find it sufficient to have opened the door for the State to introduce testimony about the facts that constituted probable cause to support the warrant. Accordingly, Appellant's Point of Error No. Eleven is overruled.

■ In Points of Error Nos. One and Two, Appellant claims the evidence was insufficient to allow a rational juror to conclude that the fire was of incendiary origin and that Appellant caused it. In analyzing these

points of error, we employ the same criminal sufficiency standards set out earlier. Appellant correctly states there is much evidence that Appellant was emotionally upset during and immediately after the fire, even attempting to reenter the house and resisting authorities' attempts to restrain her. Appellant, however, made no request for Clawson to contact authorities after Appellant knocked on the door to Clawson's house. Appellant merely wandered without direction in the yard. The jury could rationally conclude from this that Appellant was attempting to forestall the arrival of fire fighters to allow the blaze to spread, which would increase the likelihood of Richardson's death. Further, Clawson testified that she saw very little smoke come through Appellant's bedroom window when Appellant abandoned her attempt to enter the house thereby. The jury could rationally conclude from this evidence that Appellant's was a half-hearted attempt designed primarily to deflect suspicion that she was responsible for the fire. The jury could have similarly interpreted her later efforts to enter the house, all of which occurred when police and fire authorities were in positions to restrain her, and the testimony that Appellant was attired in dainty pajamas unsuitable for public display. Indeed, such an interpretation would be supported by Appellant's general belligerence toward authorities throughout the day. Further, the jury could have rationally concluded that Appellant's refusal to give a statement, a blood sample, and to consent to being photographed were a product of Appellant's concern that she was rapidly becoming the prime suspect. The jury could also have relied on Appellant's musing after arriving at the hospital that she may have only imagined Richardson awakened her and instructed her to escape through her bedroom window to conclude that she was attempting to change her explanation of events because of increased suspicion.

Appellant makes much of what one witness identified as a Class II accelerant that was found on the remnants of clothing that were recovered from Richardson's body. The clothing was tested by two different laboratories, only one of which reported the presence of accelerant. That this evidence conflicted does not mean that the jury could not choose to believe and attribute significance to one of the findings. Appellant then attempts to explain the accelerant with testimony that Richardson frequently wore grease-stained overalls that wreaked of oil even when freshly washed. Appellant further cites testimony that Richardson used a commercial solvent to remove the oil stains. Indeed, Richardson was known to be rather careless with fire, sometimes using a propane torch to light his furnace and even to roast marshmallows. Fire Marshall Salvato supported this evidence, testifying to actually watching Richardson light his furnace with a propane torch while Salvato was on the premises investigating the third fire. There was even evidence that Richardson displayed an odd fascination with the third fire, staring at its flames as if in a trance.

Appellant correctly notes that no accelerant was found on her person or her possessions. She repeatedly calls attention to the State's failure to produce or even posit the existence of the container in which the accelerant was stored or transported. She argues that Richardson's known carelessness with fire is good reason to think the fire ignited accidentally. We think Appellant's arguments on this point persuasive and well advanced. This does not, however, require that the fact finders in the instant case were in agreement with her arguments. The jury was at liberty to discount any explanatory testimony. Notwithstanding the absence of a suitable container, the jury could have rationally found that an accelerant was used to ignite the blaze and that Appellant was its source.

The jury could also have seized on Appellant's singed hair to conclude that Appellant was the ultimate source of the accelerant. The State argues that Appellant had to have been in direct contact with a flame to singe her hair. Both Clawson, who observed Appellant attempt to enter through her bedroom window, and Officer Curtis, over whom Appellant attempted to crawl while in the threshold of the house's front entrance, testified there were no flames at their positions when they occupied them, and neither witness suffered singed hair. The State argues

that Appellant must have contacted the flame when she first doused Richardson with accelerant and set the blaze, further theorizing that the ensuing fireball bounced off the ceiling to singe the hair on top of Appellant's head. Remarkably, the expert testimony differed over whether hair could singe without coming into direct contact with flame, the State's expert claiming that temperatures that would singe hair without flame would cause great collateral damage, including literal melting of human skin, which Appellant did not experience. Although this testimony strikes us as incredible, it is not so transparent that the jury could not rely on it. The jury could have rationally found that Appellant was the source of the accelerant because of her singed hair.

The jury could also have considered that if Appellant's proffered explanation that Richardson woke her and instructed her to escape were true, he would have returned to the living room and bypassed the fire extinguisher located in his office, which he had used the previous week in an attempt to extinguish the second fire. The jury could have further concluded that Appellant had set the second and third fires to gauge the response time of fire fighters, especially because there were no signs of forcible entry and because cash and weapons were undisturbed after each fire. The jury could have similarly interpreted the series of fires as an effort to frighten Appellant into drafting a will, which he apparently did shortly before his death. The jury might also have permissibly questioned how Appellant knew Richardson's location in the house, which knowledge she revealed when she told Officer Villesca that Richardson was in the living room.

The foregoing does not exhaustively chronicle the evidence adduced at Appellant's five-day trial. We have attempted to analyze in a systematic fashion both the evidence that would have allowed the jury to convict Appellant and the most relevant evidence that Appellant claims vindicates her. Nearly every element of the State's concededly circumstantial evidence may be rationally and innocently explained. The jury, however, need not have believed the innocent explanations. We find the evidence was sufficient to allow the jury, in the exercise of the discretion inherent to the fact finding function entrusted to it, to conclude the fire was of incendiary origin and that Appellant was its cause. Accordingly, Appellant's Points of Error Nos. One and Two are overruled.

■ In Point of Error No. Twelve, Appellant claims the State impermissibly commented on her failure to testify at trial. The record affirmatively demonstrates that Appellant did not testify at her trial. During argument at the punishment stage of trial, the State's attorney stated, "I've always heard that the first step to rehabilitation is for the person who needs it ... **to come forward and ask for it.**" (Emphasis added). Appellant objected to this argument, which objection was overruled. Appellant claims the foregoing was a comment on her failure to testify and violated rights guaranteed her by Article I, Section 10, of the Texas Constitution and Article 38.08 of the Texas Code of Criminal Procedure. We agree.

■ It is axiomatic that the State's attorney may not allude to or comment upon a defendant's failure to testify. TEX.CODE CRIM.PROC.ANN. art. 38.08 (Vernon 1979). For such a comment to be considered a violation, the complained of language must be manifestly intended or of such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify. *Lopez v. State*, 793 S.W.2d 738 (Tex.App.—Austin 1990), *pet. dism'd*, 810 S.W.2d 401 (Tex.Crim.App.1991).

The State attempts to trivialize the comment by pointing out that it did not identify Appellant by name. The State then advances its explanation that the comment could have referred to other witnesses, who themselves may have noted Appellant's need for rehabilitation. But these ostensible witnesses had not been convicted of murder. Moreover, other witnesses' failures to opine that Appellant needed rehabilitation are irrelevant to an assessment of the punishment appropriate for Appellant's crime, which was the issue at the punishment stage of the trial. Appellant is the only plausible person who might be expected to ask for rehabilitation. We find that the comment quite clearly identified Appellant as its object and that the

**704**

trial court erred when it overruled Appellant's objection to it.

 We must next determine if the error was harmful pursuant to Texas Rule of Appellate Procedure 81(b)(2), which provides that a cause will not be reversed if we determine beyond a reasonable doubt that the error made no contribution to the punishment. In making this assessment, we do not focus on the weight of the other evidence of guilt, but on whether the error might have prejudiced the jurors' decision-making and whether the error was of a magnitude that it disrupted the jurors' orderly evaluation of the evidence. *Harris v. State,* 790 S.W.2d 568, 587–88 (Tex.Crim.App.1989). Further, we examine the source of the error, the extent to which it was emphasized by the State, and the probable collateral implications. *Id.* at 587. We must also determine whether declaring the error harmless would encourage the State to commit the error again with impunity. *Id.*

 The argument violated a mandatory statute and was of constitutional dimension. The State argues that harm was minimized by the abandonment of the argument immediately after Appellant's objection was overruled. The harm, by then, was complete. The State had then already encouraged the jury to consider the exercise of Appellant's right not to testify as evidence of the need for greater punishment, precisely the species of argument that Section 38.08 of the Texas Code of Criminal Procedure was intended to prevent. We note that even if Appellant's objection had been sustained and the jury instructed to disregard the comment, the adverse effect of prosecutorial comment on an accused's failure to testify is not generally cured by an instruction to disregard. *Lopez v. State,* 793 S.W.2d at 741. Absent even the inadequate measure of an instruction to disregard, we cannot conclude beyond a reasonable doubt that the error made no contribution to the punishment. Accordingly, we sustain Appellant's Point of Error No. Twelve.

Having overruled Points of Error Nos. One through Eleven, and further having sustained Point of Error No. Twelve, we reverse the portion of the trial court's judgment that assesses punishment, affirm the remainder of the judgment, and remand the cause to the trial court for new sentencing proceedings.

KOEHLER, J., not participating.