**Affirmed and Opinion Filed April 17, 2015**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-13-00546-CR

### No. 05-13-00547-CR

**EDGAR ALBERTO ROMO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 199th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause Nos. 199-82866-2012 and 199-81976-2011**

## MEMORANDUM OPINION

Before Justices Fillmore and Schenck[1] and Chief Justice Thomas, Retired[2]
Opinion by Chief Justice Thomas, Retired

A jury found Edgar Alberto Romo guilty of murder and aggravated assault against a household member. The trial court assessed his punishment at life in prison for both offenses. On appeal, Romo challenges the sufficiency of the evidence to support the jury's verdict as well as a number of the trial court's evidentiary rulings. Because the issues in this appeal involve the application of well-settled principles of law, we issue this memorandum opinion. *See* TEX. R. APP. P. 47.4. We affirm the trial court's judgments.

---

[1] Justice David Schenck succeeds Justice Michael O'Neill, a member of the original panel. Justice Schenck has reviewed the briefs and record in this case. *See* TEX. R. APP. P. 41.1(a).

[2] The Honorable Linda Thomas, Chief Justice of the Court of Appeals for the Fifth District of Texas—Dallas, Retired, sitting by assignment.

**Background**

Ismael Torres owned a house in Plano, Texas; he lived in that house with his girlfriend, Leticia Romo. At different times, various members of Ismael's and Leticia's families lived with them in the home. (For clarity, we will refer to the various family members by their first names.) On June 17, 2011, Ismael's daughter, Gabriela, and her boyfriend, Luis, lived there; Leticia's son, Alex, lived there too. Leticia's older son, appellant Romo, had lived with these individuals until a few months earlier, when he moved out of the house and into a motel.

Ismael, who had been employed for years building fences, had helped Romo obtain a job building fences as well. On the morning of June 17, Romo injured his finger at work and left early. He stopped to get lunch for himself and his brother and brought it to the Plano house. The brothers ate and planned to play basketball later in the day; Romo showered, changed clothes, and—according to Alex's testimony—left the house.

Ismael returned home from work later in the afternoon. After resting, he and Gabriela sat together in the living room listening to music. Gabriela testified that she could hear the brothers talking and watching television in Alex's bedroom. She testified that Romo walked into the living room, pointed a gun at her, and said he was going to kill them. Then he shot her and turned and shot Ismael.

Alex was frightened when he heard the shots, but after several minutes he came into the room, and Gabriela asked him for help. He testified he first tried to call 911 from her phone in the living room, and then from his own phone. Finally, the 911 operator called him back. Emergency personnel and police officers were sent to the house shortly before six o'clock. When they arrived at the house, Alex was waiting for them outside. One officer testified Alex told him his brother had "done this." A second officer testified Alex later indicated to her that he was afraid Romo might have done it. At trial, Alex denied making either of those statements.

In the house, police found Gabriela was conscious and asking for help, but Ismael was already dead. One officer asked Gabriela who had shot her, and she named Romo by both first and last names. A second officer who spoke Spanish arrived and spoke to Gabriela; she repeated to him that Edgar Romo had shot her. The officer went to the hospital and spoke to Gabriela again there. Once again, she identified Romo as the person who shot her, and she gave the police a description of him, his clothing, and the car he was driving.

The police obtained an arrest warrant for Romo, and Sergeant Terence Holway came upon Romo at approximately eleven o'clock that night. Romo was talking on a pay phone close to the North Dallas motel where he had been staying. Holway asked Romo if he was Edgar Romo, and when Romo said yes, Holway arrested him. Romo was brought to the police station, where he was interviewed by Detective Charles Marks. In connection with the interview, the State's gunshot residue expert, Anne Koettel, tested Romo's hands. She found gunshot residue on the band-aid on Romo's injured finger. She also found particles "consistent with" gunshot residue on his hands.[3] Koettel testified she also found gunshot residue on the hands of Ismael, Gabriela, and Alex.

The State offered evidence that Romo's cell phone was in the vicinity of the Plano house shortly after noon. It was in the vicinity of his North Dallas motel from approximately two thirty until four o'clock. Then, shortly after four thirty, the phone was again in the vicinity of the Plano house. Only after seven o'clock was the phone located close to his sister Rosa's Dallas apartment, where Romo contends he spent most of the afternoon and evening. The State also offered evidence that Romo's phone contained a string of text messages indicating his attempt to purchase 45 caliber ammunition, the size used in the shooting of Ismael and Gabriela.

---

[3] Koettel explained that a particle containing antimony, barium, and lead is considered characteristic of gunshot residue. A particle containing only two of those elements is considered "consistent with" gunshot residue.

**Sufficiency of the Evidence**

In issue three, Romo contends the evidence is insufficient to support his convictions for murder and aggravated assault. A person commits the offense of murder if he intentionally or knowingly causes the death of an individual or intends to cause serious bodily injury and commits an act clearly dangerous to human life, which causes the death of an individual. TEX. PENAL CODE ANN. § 19.02 (West 2011). A person commits the aggravated assault charged in this case if he intentionally, knowingly, or recklessly causes bodily injury to a person living (or who has lived) in the same household, while using or exhibiting a deadly weapon. *Id.* §§ 22.01(a)(1) (West Supp. 2014), 22.02(a)(2) (West 2011). Romo specifically challenges the sufficiency of the evidence that it was he who shot and killed Ismael and who shot and injured Gabriela.[4]

We review this challenge by examining the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury exclusively determines the credibility of the witnesses and the weight to be given their testimony. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012). Our duty is to ensure that the evidence presented supports the jury's verdict and that the State has presented a legally sufficient case of the offense charged. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We use the same sufficiency standard of review for both circumstantial and direct evidence cases. *Id.*

---

[4] The parties concede the same person shot both Ismael and Gabriela.

The State relies first and foremost on Gabriela's identification of Romo as the person who shot her. The evidence indicates she consistently identified Romo as the shooter both at the house and at the hospital. Gabriela's trial testimony was consistent with her earlier statements: she identified Romo as the shooter; she described him standing and pointing the gun at her; she stated she did not have time to say anything to him; she just turned and looked right at him, and he fired. When asked if she was sure it was Romo, she answered "Yes. I saw him."

Romo challenges Gabriela's identification based upon her condition after the shooting. He challenges her ability to think clearly given the trauma she experienced. The significance of her injuries was reported by her treating physician in the emergency room, Doctor James Frame. Romo also points to a different identification reported by Frame, who testified he recalled Gabriela naming "Bernadette" or "Bernabrene" as the shooter. Frame also remembered Gabriela describing a fight in her "apartment" involving "a love triangle." The record established that Gabriela's estranged husband was named Bernabe. But Frame's records did not include any of this identification, and he acknowledged he was testifying from his memory. In fact, the records from which Frame testified at trial contained only the name "Jane Doe," and the date of birth in those records did not match Gabriela's.

The State also offered circumstantial evidence of Romo's identity as the shooter. Cell phone records indicated his phone was near the Plano house close to the time of the shooting and that he had agreed to purchase ammunition matching that used in the shooting. Romo argues there is no evidence he was using the phone at either of those points in time. The State also offered evidence that gunshot residue was found on the band-aid on Romo's finger. Romo points to testimony indicating residue can be transferred by contact in such places as a police car or police station. He stresses that Alex's hands contained more residue than his own.

The jury considered all this evidence. It heard both Frame's and Gabriela's testimony and determined the weight to give their identifications. Likewise, the jury heard the circumstantial evidence of identity and decided the weight to give it. *See Wise*, 364 S.W.3d at 903 (jury exclusively determines weight to be given witnesses' testimony). We conclude a rational jury could have found beyond a reasonable doubt that Romo was the person who committed the murder and the aggravated assault in this case. *See Jackson*, 443 U.S. at 319.

We overrule Romo's third issue.

## Evidentiary Issues

Romo's remaining issues challenge trial court rulings admitting, excluding or publishing evidence. We review such rulings for an abuse of discretion. *McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005). If the trial judge erred in determining the admissibility of evidence offered by the State, this error must have been preserved by a specific, timely objection and a ruling on that objection. *Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003). "In fact, almost all error—even constitutional error—may be forfeited if [Romo] failed to object." *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008).

In his first two issues, Romo argues the trial court abused its discretion by admitting statements made by Romo after he was arrested, but before police advised him of his rights under the Fifth Amendment to the United States Constitution and article 38.22 of the Texas Code of Criminal Procedure. The statements at issue were made to the arresting officer, Sergeant Holway, who had come upon Romo while the latter was talking on a pay phone. After arresting Romo, Holway discovered Romo was carrying a cell phone. Curious, the sergeant asked Romo about his use of the pay phone. Romo replied that "he was talking to his dad in Mexico, trying to get home." Romo argues the State stressed his statement at trial to establish his consciousness of guilt by implying Romo was intending to flee Texas.

Romo concedes that his counsel raised no objection at trial to the State's use of his words against him.  He concedes as well that settled Texas law requires such an objection in order to complain on appeal about the admissibility of statements within the framework of *Miranda*.[5]  *See Ex parte Bagley*, 509 S.W.2d 332, 333 (Tex. Crim. App. 1974).  Nevertheless, Romo urges this Court to reconsider this rule and to hold that self-incrimination protections rise to the level of fundamental rights, which may be raised for the first time on appeal.   As an intermediate court, this Court is not free to disregard the decisions of the Court of Criminal Appeals.  We decline Romo's invitation to do so.  We conclude Romo did not preserve error on his first and second issues; we overrule them.

In his fourth issue, Romo contends the trial court erroneously admitted irrelevant character evidence concerning his prior arrests.  He argues the evidence encouraged the jury to find him guilty because he was a bad person rather than on competent evidence of the offense charged.   The complained-of testimony was elicited during the following exchange between Romo's counsel and Sergeant Holway:

| Defense Counsel: | You were asked to search for Edgar Romo.  Correct? |
| Holway: | Correct. |
| Defense Counsel: | What description were you given to look for to try to find him? |
| Holway: | He gave us a physical description plus photographs from previous, um, arrests. |

Romo may not complain of testimony that he elicited on cross-examination.  *Ingham v. State*, 679 S.W.2d 503, 507 (Tex. Crim. App. 1984).   Once the witness volunteered the testimony concerning previous arrests, defense counsel could have objected to it as nonresponsive.  No

---

[5]  *See Miranda v. Arizona*, 384 U.S. 436 (1966).

objection was lodged in the trial court, so we have no ruling to review. We overrule Romo's fourth issue.

In his fifth issue, Romo argues the trial court abused its discretion by allowing the State to publish evidence containing audio of him invoking his right to counsel. After he was arrested, Romo agreed to give a statement to police; the interview was recorded. In the course of the interview, the officer discussed Romo's undergoing a test for gun-shot residue and, Romo contends, he asked for counsel at that time. Again, Romo concedes that his counsel failed to object to the publication of the recording at trial, but he contends the publication was fundamental error. We disagree. Allowing a jury to hear that the defendant invoked his right to counsel is not fundamental error. *See Reyes v. State*, 267 S.W.3d 268, 273 (Tex. App.—Corpus Christi 2008, pet. ref'd); *Cacy v. State*, 901 S.W.2d 691, 699 (Tex. App.—El Paso 1995, pet. ref'd). Romo has preserved nothing for our review in this issue. *Rezac v. State*, 782 S.W.2d 869, 871 (Tex. Crim. App. 1990). We overrule his fifth issue.

In his sixth issue, Romo contends the trial court abused its discretion by admitting evidence of Ismael's alleged good character for peacefulness. Evidence of the character of a victim is ordinarily not admissible to show action in conformity with that character. An exception exists for "evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor." TEX. R. EVID. 404(a)(2). However, as Romo points out, his theory of the case was not that Ismael had attacked him first. Instead, Romo's defense was that someone else fired the shots that killed Ismael and injured Gabriela. The exchange of which Romo complains took place between the prosecutor and the lead detective on the case, Detective Charles Marks:

> Prosecutor: Detective, are you aware of any – did you run down other suspects, other possible leads in this case, during your investigation?

| Marks: | Traditionally, we explore any possibility or any lead that's made available to us. An example would be other like offenses occurring in the Metroplex, and there was not. So no leads were accepted from that. No one ever offered any other possible suspect. We were only told that Mr. Torres had no enemies, was not confrontational, and did not live a lifestyle that would encourage something like this to happen to him. So no other leads were really available. |
|---|---|

In context, we question whether Marks's response was really a declaration of Ismael's character for peacefulness or merely one of a number of circumstances that failed to provide the police with leads on other suspects. Nevertheless, we need not make that determination because Romo did not lodge an objection to Marks's response. He has forfeited any complaint on this issue. *See Fuller*, 253 S.W.3d at 232. We overrule issue six.

In his seventh issue, Romo contends the trial court's limitation of his expert's testimony denied him his right to present a defense. Romo states that his expert, Dr. Ron Fazio, "was called to suggest that the gunshot residue test results were open to interpretation and ultimately inconclusive with respect to any perceived link between Romo with the commission of the crime." Romo argues Fazio was unable to voice these opinions, but he does not focus his briefing on particular questions or objections so that we can identify the specifics of his complaint. Instead, he quotes excerpts from approximately fourteen pages of the record.[6] Within those pages, the State objected to Fazio's testimony nine times: three objections were sustained, two were overruled, and four directed Romo's counsel to rephrase his question in some fashion.

If we focus on the three objections that were sustained, we cannot say that Romo's defense was compromised. The State raised all three objections during exchanges between Romo's counsel and Fazio concerning the gunshot residue found on the hands of Alex Romo. In

---

[6] Appellant's quotes begin on page 88 of Volume 6 of the Reporter's record; the final quote is from page 101 of that volume.

the first two instances, the State objected to questions asking Fazio (1) whether it was more likely Alex had fired a firearm or was near a firearm than Edgar, and (2) his interpretation of the amount of gunshot residue found on Alex's hands. In both instances, the State contended the questions fell outside Fazio's realm of expertise, and the trial court agreed. However, after these rulings, Romo's counsel spent more than six pages of the record developing Fazio's background and experience more fully. He was then permitted—over objection by the State—to ask whether Fazio could rule out accidental transfer of gunshot residue particles on Alex's hands; Fazio responded that he could neither rule out nor prove accidental transfer. Only when the expert deviated into a discussion of "characteristic particles" did the trial court sustain the third objection, which was to non-responsiveness of the answer.

From this point in the examination, Romo proceeded to elicit testimony from Fazio that the State's residue findings indicate that Alex was near a firearm or fired one. The trial court then permitted Fazio to expand on how he interpreted the residue findings. Asked whether Alex's test results were consistent with someone holding a gun in two hands, Fazio testified (again over objection):

> I can't answer that. The – I wasn't – the nature of gunshot residue testing is not specific like that. That transfer could be from just being in the presence; it could be from handling something that was in the presence. Um, the fact that there was nothing found on the palms could be caused by the fact that it's around, but it's not indicative or consistent or it – it – it is what it is.

Through follow-up questions, Fazio was permitted to testify as to the likelihood that Alex's results were caused by picking up a cell phone: "I wouldn't imagine so. You would expect, if there's a transfer from a cell phone to the hands, it would be on the fingers, and possibly the palm. I don't see how you get it on the back [of the hand]." Similarly, when asked whether Alex could have gotten the residue from a doorknob, Fazio stated:

> Again, I -- I -- there are no hard facts with gunshot residue, but I – I'd have a hard time understanding how particles would get on the back of the hand if you're handling something that has gunshot residue on it.

We conclude that after his credentials were sufficiently explained, Fazio testified at some length as to his interpretation of Alex's gunshot residue test results. Romo was able to make his point that the residue tests could support an inference that Alex was the shooter rather than Romo.

These are the only objections identified with sufficient specificity to allow our review. We conclude Romo was able to offer testimony satisfying his purpose in calling Fazio, i.e., establishing that the test results were open to interpretation and that they did not necessarily point conclusively to Romo as the shooter. Accordingly, Romo was not prevented from presenting this portion of his defense to the jury.

We overrule the seventh and final issue.

## Conclusion

We have decided each of Romo's issues against him. Accordingly, we affirm the trial court's judgments.

Do Not Publish
TEX. R. APP. P. 47
130546F.U05

/Linda Thomas/
_____
LINDA THOMAS
CHIEF JUSTICE, RETIRED

–11–



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

EDGAR ALBERTO ROMO, Appellant

No. 05-13-00546-CR        V.

THE STATE OF TEXAS, Appellee

On Appeal from the 199th Judicial District Court, Collin County, Texas
Trial Court Cause No. 199-82866-2012.
Opinion delivered by Chief Justice Thomas, Retired. Justices Fillmore and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 17, 2015.



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

EDGAR ALBERTO ROMO, Appellant

No. 05-13-00547-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 199th Judicial District Court, Collin County, Texas
Trial Court Cause No. 199-81976-2011.
Opinion delivered by Chief Justice Thomas, Retired. Justices Fillmore and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered April 17, 2015.