

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JUAN DAVID ORTIZ, | § | No. 08-23-00025-CR |
| Appellant, | § | Appeal from the |
| v. | § | 406th Judicial District Court |
| THE STATE OF TEXAS, | § | of Webb County, Texas |
| Appellee. | § | (TC#2018CRA001475D4) |

## MEMORANDUM OPINION

Based on the jury verdict below, four times in September 2018, Appellant David Ortiz picked up prostitutes, brought them to remote areas, then shot and killed them execution style. Because a fifth woman narrowly escaped from Appellant and identified him to authorities, he was arrested and eventually confessed. Appellant was convicted of capital murder of multiple persons and sentenced to life in prison. In this appeal from that conviction, he argues that the trial court erred in failing to suppress his confession and evidence obtained from a warrantless search of his truck. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The events we describe here occurred in Webb County; following a change of venue, the case was tried in Bexar County.[1]

Erika Pena supported herself through prostitution.[2] She knew Appellant as a client for some five or six months. In the early afternoon of September 14, 2018, he picked her up as she stood in front of a motel. Appellant was driving in his white Dodge pickup with distinctive disabled veteran license plates. Erika was somewhat apprehensive that day because another prostitute had recently been found dead and "all the girls were watching their back[.]"He took her to buy heroin and they went to his house. But when they got there, Appellant mentioned that he had been with one of the murdered girls. Erika then became scared and physically ill. When she insisted on leaving, Appellant drove her to a place where he parked behind a tractor trailer. There, he pulled out a gun and pointed it at her. She fled the vehicle following a struggle where she lost her shirt and left her purse behind. She flagged down a state trooper at a nearby store and told him what happened.

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Fourth Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

[2] The facts recited here are taken from several suppression hearings challenging the evidence seized from Appellant's truck and confession. But because these same issues were also litigated at Appellant's trial, we must also consider the evidence from the trial record as well. *See Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996) (en banc) ("[I]t would be unreasonable to ignore trial evidence in our review of the court's suppression decision only to be confronted by the evidence in our consideration of whether the error was harmless."); *Turrubiate v. State*, 415 S.W.3d 433, 438 (Tex. App.—San Antonio 2013, pet. ref'd) (noting that "when the State raises the suppression issues at trial 'either without objection or with subsequent participation in the inquiry by the defense,' we may consider the record in its entirety.") (quoting *Rachal*, 917 S.W.2d at 809); *Matter of B.S.P.*, No. 04-14-00067-CV, 2014 WL 5464072, at *1 (Tex. App.—San Antonio Oct. 29, 2014, no pet.) (mem. op.) ("When, as here, the voluntariness of a statement is consensually re-litigated at trial, we are not limited to the evidence presented at the suppression hearing; we may also consider the evidence presented at trial.").

Erika was quickly taken to Captain Fred Calderon, the lead Webb County investigator for the murders. She related to Calderon how Appellant reacted strangely when the murders came up, how she knew that Appellant had picked up one other murder victim in the past, how he had pointed a semi-automatic handgun at her that night in the Dodge truck, and she contended that he was the murderer. With the information she provided, law enforcement identified Appellant who was a border patrol supervisor and the white Dodge pickup that he drove. They immediately issued a request to all law enforcement to be on the lookout for Appellant and his truck. Later that evening, a DPS trooper saw Appellant park at a convenience store and go inside. The trooper called for back-up and when Appellant walked out of the store, two troopers with weapons drawn confronted Appellant. In the ensuing dialog, Appellant acknowledged to the officers that the Dodge truck was his. They told him that his truck matched the description of one in relation to the recent murders and they wanted to question him. He was ordered to turn around so the that the officers could approach him. Instead, after a few tense moments, Appellant fled on foot. He was found hours later in the bed of a pick-up truck in a hotel parking garage. While being transported to the substation, the officers in the vehicle were discussing the location of Appellant's gun. He volunteered that the gun was in a door panel of his Dodge truck.

Around 2:50 a.m., Appellant was brought to the substation and placed in an interrogation room. A video documents the entire interrogation. That video, as well as a transcript of the recording, were admitted as evidence at trial and is part of the record before us.

Captain Calderon and Texas Ranger E.J. Salinas conducted the interrogation. They began by reading Appellant his rights. Although Appellant refused to sign a waiver of those rights, he answered their questions. At first, Appellant denied that he knew Erika or had committed the murders. The questioning was interrupted by three long breaks. Calderon later explained that the

3

breaks resulted from the discovery of a third victim and his need to coordinate with law enforcement to process the scene of that crime. Appellant eventually confessed to all three murders, as well as a fourth murder that law enforcement did not yet know about.[3] During the confession, Appellant stated that he was "clean[ing] up the streets" of Laredo.

Appellant's Dodge truck was towed to a secure Sheriff's Office substation. While Appellant was being interviewed, an investigator from the Sheriff's Office searched the vehicle.[4] Photographs taken before the truck was towed show two women's purses in plain view on the floorboard. Those were recovered during the search, as well as a pistol and ammunition clips with live rounds found in the driver's side door pocket. A forensic firearm analyst found that bullets and fragments recovered from the crime scenes and victims were fired from the same gun found in the truck—a government issued HK pistol. Tire tracks from Appellant's truck matched to those at the crime scenes as well.

Before trial, Appellant moved to suppress evidence obtained from the truck and his confession. After a hearing in June 2020, the trial court denied the motion. Relevant to the issues before us, the trial court made these findings germane to the search of Appellant's truck:

1. The Court finds and concludes that at the time when the police initially approached Defendant Juan David Ortiz there existed reasonable suspicion for his detention.

2. The Court finds and concludes, by clear and convincing evidence, that the moment that Defendant Ortiz fled from the police and away from his vehicle, after his initial and lawful detention, he abandoned any expectation of privacy for any property inside his vehicle and the automobile exception to the warrant requirement was triggered.

---

[3] Appellant committed the third and fourth murder after Erika had escaped, but before Appellant was spotted at the convenience store.

[4] An investigator had also photographed the truck, including the interior, while it was still at the convenience store. He testified that he did so to preserve the appearance of the truck as it was found but he did not search it there. Appellant's counsel introduced photos of the truck taken at the store with the driver's and passenger's side doors open.

Appellant's suppression motion challenged several aspects of his interview and confession. Appellant first claimed that the interview was not voluntary as he first declined to sign an acknowledgment form of his rights and when asked, first declined to tell his side of the story. The trial court concluded otherwise:

4. The Court finds that Ranger EJ. Salinas and Captain Fred Calderon read Defendant Juan David Ortiz the *Miranda Rights.*

.     .     .

7. The Court finds that prior to Defendant Juan David Ortiz making his statement(s) the interviewing officers ensured that Defendant Ortiz' rights under §38.22 of the Texas Code of Criminal Procedure were explained to, and understood by, Defendant Ortiz.

8. The Court finds and concludes, by clear and convincing evidence, that, by his words and actions, Defendant Juan David Ortiz waived his rights under §38.22 of the Texas Code of Criminal Procedure.

9. The Court finds and concludes, by clear and convincing evidence, that Defendant Juan David Ortiz' statement(s) was/were made voluntarily and was/were the product of a free and deliberate choice.

10. The Court finds that Defendant Ortiz' continuous reference to *how the officers already knew certain things* showed Defendant Ortiz' comprehension of police investigations.

11. The Court finds that Defendant Ortiz' employment as a United States Border Patrol Supervisor demonstrates a high level of comprehension of his legal rights.

12. The Court finds and concludes that Defendant Ortiz' conduct and calm demeanor during the interview together with his desire to share details of what had occurred demonstrated a free and deliberate choice to make an intelligent and voluntary statement and inferred, by clear and convincing evidence, a willingness to waive his rights.

Appellant also claimed that he was induced to confess based on "promises" made by the interviewers. The trial court's findings addressed and rejected that claim:

14. The Court finds, by clear and convincing evidence, that Defendant Ortiz was not coerced, deceived or intimidated during his detention and/or during his interview.

5

15. The Court finds, by clear and convincing evidence, that Defendant Ortiz was not induced by his own request to obtain a photograph of his family and when officer "made no guarantee."

16. The Court finds, by clear and convincing evidence, that Defendant Ortiz was not induced when the interviewing officer said "he'd put in a good word to the D.A." [who was present outside the interview room].

And Appellant contended that the length of the interview rendered his confession involuntary. The trial court also addressed findings to that issue:

17. The Court finds that Defendant Ortiz was interviewed for approximately ten hours.

18. The Court finds and concludes that Defendant Ortiz' interview was not unreasonably long and therefore the length of the interview did not render an otherwise voluntary statement involuntary. Moreover, the Court finds that during the interview, Defendant Ortiz was offered food and water and Defendant Ortiz was not denied restroom breaks and he was not threatened, coerced or mistreated at any point during the entire interview.

Appellant later asked to re-open the hearing to address the search of the vehicle and whether the initial search was an inventory search. After taking additional testimony from the officers who confronted Appellant at the convenience store, and the investigator who searched Appellant's truck, the trial court re-affirmed its earlier ruling and findings of fact and conclusions of law.

The search of the truck and the confession were a central focus of the trial. The jury was given over two pages of instructions on the confession and were told that they could consider "A statement of an accused . . . only if the statement was freely and voluntarily made without compulsion or persuasion" which must be shown beyond a reasonable doubt. The jury was further instructed on the necessity and content of *Miranda* warnings, and the prohibition of confessions obtained by coercion, threats, or inducements.

Finally, the jury was instructed that it could not consider evidence obtained in violation of any provisions of the Constitution or laws of the State of Texas, or the United States, and the State

carried the burden to show beyond a reasonable doubt, that the evidence was not obtained in violation of the law. The jury was instructed not to consider any evidence from the search of Appellant's truck unless it found beyond a reasonable doubt that:

(1) the Defendant abandoned his white truck, or

(2) that the officers searched the truck at the [convenience store] and/or the Webb County Sheriff''s Office substation pursuant to a valid inventory search, or

(3) the searching officer had probable cause to search the truck at the [convenience store] and/or the Webb County Sheriff's Office,

Appellant's closing argument to jury almost exclusively dealt with these instructions and asked the jury to not consider either the confession or the evidence seized from the truck. Necessarily, the jury rejected those arguments as its verdict found Appellant guilty of capital murder of multiple persons. Following his conviction, the judge assessed a mandatory life sentence without parole. Appellant raises two issues on appeal. He first challenges the denial of his motion to suppress the evidence obtained in the search of his truck. Second, he challenges the denial of his motion to suppress his confession. We take those issues in reverse order.

## DISCUSSION

### A. Standard of review

Appellate courts review a trial court's ruling on a motion to suppress under a bifurcated standard. *See State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020). A trial court's findings of historical fact, and determinations of mixed questions of law and fact that turn on credibility and demeanor, are afforded almost total deference if they are reasonably supported by the record. *See id., citing Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App. 2019).

The same deferential standard of review is applied to a trial court's determination of facts that are based on a video recording admitted at the suppression hearing. *See State v. Duran*, 396

7

S.W.3d 563, 570 (Tex. Crim. App. 2013). That said, appellate courts may review de novo "indisputable visual evidence" contained in a videotape. *Id.* A trial court's application of the law of search and seizure to the facts is also reviewed de novo. *See id.*

When the trial court makes findings of fact, a reviewing court determines whether the evidence, viewed in the light most favorable to the court's ruling, supports those findings. *See Abney v. State*, 394 S.W.3d 542, 548 (Tex. Crim. App. 2013). The prevailing party is afforded the "strongest legitimate view of the evidence," along with all reasonable inferences that can come from it. *Duran*, 396 S.W.3d at 571, *quoting State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011).

<h2 style="text-align:center">ADMISSIBILITY OF APPELLANT'S CONFESSION</h2>

"Under the Due Process Clause and articles 38.21 and 38.22 of the Texas Code of Criminal Procedure, a confession must be 'voluntary' to be admissible." *Lopez v. State*, 610 S.W.3d 487, 494 (Tex. Crim. App. 2020). For several reasons we address below, Appellant argues that the interrogation violated his constitutional and statutory rights, resulting in an involuntary and inadmissible confession.

### A. Did Appellant waive his *Miranda* and Article 38.22 rights?

Due process and Texas state law require that, before questioning, an accused be informed of his rights to remain silent, to an attorney, and to terminate the interview. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); Tex. Code Crim. Proc. art. 38.22 § 2(a). To use a defendant's statement against him, he must have "knowingly, intelligently, and voluntarily" waived those rights. Tex. Code Crim Proc. art. 38.21, 38.22 § 2(b).

Before the interview, Texas Ranger Salinas asked Appellant, "Are you waiting to tell us your side of the story . . . ?" to which Appellant answered "no." Salinas then read him his rights

and Appellant acknowledged that he understood them, but he refused to sign a written waiver. Appellant characterizes the interview that followed as a "blatant disregard of [Appellant]'s refusal to waive his warnings."

A waiver of rights need not take a certain form. "[N]either a written nor an oral express waiver is required." *Watson v. State*, 762 S.W.2d 591, 601 (Tex.Crim.App.1988) (en banc); *see also Joseph v. State*, 309 S.W.3d 20, 23 (Tex. Crim. App. 2010). Instead, we consider the totality of the circumstances. *Lopez v. State*, 610 S.W.3d 487, 494 (Tex. Crim. App. 2020). To waive his rights, a defendant must have had "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it" and the waiver must have been a voluntary choice. *Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011).

The trial court found that Appellant had "a high level of comprehension of his legal rights." This finding is supported by the record. Appellant has a master's and bachelor's degree in Criminal Justice Forensics. He was an experienced Border Patrol supervisor who worked in its Intelligence Unit. *See Joseph v. State*, 309 S.W.3d at 24–25 (the defendant's experience and background are factors when determining whether the whether he validly waived his rights). The trial court also found that Appellant's "conduct and calm demeanor during the interview together with his desire to share details of what had occurred demonstrated . . . a willingness to waive his rights." We agree. Despite refusing to sign the waiver, Appellant continued to answer questions. Appellant never asked for an attorney or to stop the questioning. We agree that the record supports the trial court's finding that Appellant voluntarily waived his right to remain silent.

### B. Was Appellant's statement involuntary?

In addition to voluntarily waiving his rights, Appellant's statements themselves must have also been voluntary. Appellant argues that his confession was "the fruit of an unreasonably

9

lengthy, continuous interrogation, deprivation of sleep, [and] improper inducements." "A statement is 'involuntary,' for the purposes of federal due process, only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995) (en banc); *see also Contreras v. State*, 312 S.W.3d 566, 574 (Tex. Crim. App. 2010) ("Coercive government misconduct renders a confession involuntary if the defendant's 'will has been overborne and his capacity for self-determination critically impaired.'") (*quoting Schneckloth v. Bustamonte*, 412 U.S. 218, 225–26 (1973)).

### (1) Duration of interrogation

That an interrogation is long does not, by itself, make it coercive. Courts instead consider the totality of the circumstances, such as whether the defendant had an opportunity for breaks, food, and water. *See, e.g., Fineron v. State*, 201 S.W.3d 361, 366 (Tex. App.—El Paso 2006, no pet.) (holding that a confession was not involuntary even though the interrogation was seven hours long, noting that the defendant had water, food, and breaks)*; Downs v. State*, No. 10-01-223-CR, 2003 WL 1589536, at *2–3 (Tex. App.—Waco Mar. 26, 2003, pet. ref'd) (mem. op., not designated for publication) (holding that confession was not involuntary when defendant was questioned for seven hours and wrote his statement for another two hours when he was provided breaks, food, and water); *Smith v. State*, 779 S.W.2d 417, 428 (Tex. Crim. App. 1989) (en banc) (affirming trial court's finding of voluntariness despite fact that defendant was questioned "continuously for eight hours without having slept the night before, and without being fed"). On the other hand, the Court of Criminal Appeals in *Oursborn v. State* summarized situations that have been found as coercive:

> (1) the suspect was subjected to a four-hour interrogation while incapacitated and sedated in an intensive-care unit; (2) the suspect, while on medication, was

interrogated for over eighteen hours without food, medication, or sleep; (3) the police officers held a gun to the head of the wounded suspect to extract a confession; (4) the police interrogated the suspect intermittently for sixteen days using coercive tactics while he was held incommunicado in a closed cell without windows and was given limited food; (5) the suspect was held for four days with inadequate food and medical attention until he confessed; (6) the suspect was subjected to five days of repeated questioning during which police employed coercive tactics; (7) the suspect was held incommunicado for three days with little food, and the confession was obtained when officers informed him that their chief was preparing to admit a lynch mob into the jail;(8) the suspect was questioned by relays of officers for thirty-six hours without an opportunity for sleep.

*Oursbourn v. State*, 259 S.W.3d 159, 170–71 (Tex. Crim. App. 2008) (internal citations omitted).

In this case, Appellant arrived at the station shortly before 3:00 a.m. and the questioning started around 3:20 a.m. Although it continued until about noon, almost nine hours later, Appellant had three substantial breaks totalling more than four hours. He was offered and provided with food and water and allowed to use the restroom whenever he requested. He was asked if he was comfortable; the handcuffs were moved and eventually taken off to make him more comfortable. Calderon and Salinas treated Appellant with respect throughout the interrogation. They did not make threats or raise their voices.

Because of the events the night before, including Appellant's fleeing and hiding from law enforcement, he had not slept when he was brought to the station in the middle of the night. "A suspect's lack of sleep, alone, does not make a statement coercive in violation of due process." *Sandoval v. State*, 665 S.W.3d 496, 523–24 (Tex. Crim. App. 2022) (stating as in this case "some lack of sleep was inevitable given that Appellant appears to have fled until law enforcement caught up with him at 2:00 in the morning"). During the time Appellant was in the interrogation room, he did not sleep, although he did put his head on the table during his long breaks. When asked if he was sleepy, Appellant responded, "A little." And when asked if he wanted to go to bed, he answered "yeah." But he did not protest continuing with the interrogation or at any time ask if he

11

could stop to sleep. *See Barney v. State*, 698 S.W.2d 114, 121 (Tex. Crim. App. 1985) (en banc) (holding that confession made after 16 hours of not sleeping was voluntary, noting that there was no evidence that defendant had been "deprived" of sleep or that he had requested sleep).

**(2) Promises**

Appellant also claims that his will was overborne, and he was coerced to confess because of promises made by Calderon and Salinas. To "render a confession invalid . . . the promise must be positive, made or sanctioned by someone in authority, and of such an influential nature that it would cause a defendant to speak untruthfully." *Martinez v. State*, 127 S.W.3d 792, 794 (Tex. Crim. App. 2004); *Medrano v. State*, 579 S.W.3d 499, 503 (Tex. App.—San Antonio 2019, pet. ref'd).

Calderon and Salinas told Appellant that the District Attorney was at the station and that "now is the time, if you want us to put in a good word in for you . . . "; "[h]elp us show the D.A. that you're cooperating with us." While their statements imply that Appellant may benefit from cooperating, they never promised leniency or indicated that the officers even have that authority. *Alvarado v. State*, 912 S.W.2d at 211 (holding that a confession was rendered involuntary when it was made after officers promised to "tell the judge to take it easy" on the defendant); *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993) (en banc) (noting that although defendant had been told that confessions can result in leniency, it was a statement of fact and not a promise of leniency in exchange for a confession); *Johnson v. State*, 68 S.W.3d 644, 654–55 (Tex. Crim. App. 2002) (holding that the detective did not make a coercive promise by telling the defendant that his honesty would be relayed to the court and prosecutor, but that he could not make any promises about whether they would seek the death penalty).

12

Appellant also contends that he was induced to confess by promises made about his wife. Early in the interrogation, Appellant asked Calderon and Salinas to try to stop his wife, who was driving back to Laredo, and tell her to remain in San Antonio (apparently to protect her from the scene when they searched the house). Calderon responded, "I will do my best," but was clear that they could not make her go back to San Antonio. At no time did they demand a confession in return for that help. Appellant later asked that they print a picture of his family and Calderon stated, "I'll even ask the Sheriff for permission to let you take [the picture] in [to prison] . . . I can work on that." Again, they made no guarantees or demanded anything in return. Appellant, worried about how his wife will manage financially, told Calderon and Salinas that he wanted her to access his retirement. Calderon responded, "I don't know, but I can find out. You know that. That's stuff that we can work on." The statement lacks the definitiveness to constitute an inducement, and nothing suggests that these Texas peace officers had any control over a federal retirement benefit. *See Vieira v. State*, No. 08-16-00100-CR, 2018 WL 3084155, at *7 (Tex. App.—El Paso June 22, 2018, no pet.) (not designated for publication) (Ranger's statement that he would "see what he could do" was not a promise inducing a confession).

Calderon and Salinas did not make any promises to Appellant in any of these instances and, even though they reminded him of how they were helping him, they did not demand a confession in return. But, even if their statements were promises, a promise of pictures or to find out information about retirement is not of "such an influential nature" that it would have induced Appellant to untruthfully confess to four murders. *Martinez*, 127 S.W.3d at 794; *Jacobs v. State*, 787 S.W.2d 397, 399–400 (Tex. Crim. App. 1990) (en banc) (promise to allow one-hour visit by girlfriend would not cause defendant to incriminate himself).

### (3) Medication and intoxication

In his appellate brief, Appellant notes that he was on medication and had drunk beers the night of his arrest. Appellant did not raise this ground for suppression in the trial court and has not preserved the issue for appeal. *Little v. State*, 758 S.W.2d 551, 564 (Tex. Crim. App. 1988) (en banc) ("In order to complain on appeal about the admissibility of a confession there must have been an objection thereon in the trial court, and the objection must have called the attention of the trial court to the particular complaint raised on appeal."); Tex. R. App. P. 33.1. Yet based on this record neither fact would have required suppression. Appellant was prescribed medication for anxiety, depression, irritability, and anger and said that the medicine made him "feel calm and at peace." There was no evidence that the medications that he took daily would render his confession involuntary. *Cf. Townsend v. Sain*, 372 U.S. 293, 307–08 (1963) (holding that confession to be involuntary when medication acted as a truth serum), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). Nor does intoxication necessarily render a confession involuntary. *Garcia v. State*, 919 S.W.2d 370, 387 (Tex. Crim. App. 1994) (en banc) (per curiam) (op. on reh'g). Calderon testified at the suppression hearing that Appellant did not appear to be under the influence of drugs or alcohol.

In sum, the evidence supports the trial court's findings (echoed by the jury) that Appellant freely and voluntarily confessed to the crimes without the coercion, duress, or inducement. We overrule Appellant's second issue.

In his first issue, Appellant challenges the warrantless search of his truck.[5] "Pursuant to the Fourth Amendment, a warrantless search is *per se* unreasonable unless it falls within a warrant exception." *Marcopoulos v. State*, 538 S.W.3d 596, 599 (Tex. Crim. App. 2017). The trial court's finding set out two of those exceptions. First, the trial court found that Appellant lacked standing to challenge the search because he abandoned the truck when he fled. Second, the trial court found that the search fell within the automobile exception that allows for warrantless searches.

## A. Automobile exception

"Under the automobile exception, law enforcement officials may conduct a warrantless search of a vehicle if it is readily mobile and there is probable cause to believe that it contains contraband" or evidence of a crime. *Keehn v. State*, 279 S.W.3d 330, 335 (Tex. Crim. App. 2009); *Neal v. State*, 256 S.W.3d 264, 282 (Tex. Crim. App. 2008). We must uphold a trial court's ruling on a motion to suppress if the ruling is correct under any theory of law applicable to the case. *State v. Copeland*, 501 S.W.3d 610, 612–13 (Tex. Crim. App. 2016). "A 'theory of law' is applicable to the case if the theory was presented at trial in such a manner that the appellant was fairly called upon to present evidence on the issue." *Id.* at 613. The automobile exception was addressed in the argument below, at least in passing by both sides.[6] And the exception is expressly raised by the trial court's findings. Yet Appellant does not address the automobile exception in his briefing to this Court. "If the appellant fails to argue a 'theory of law' applicable to the case on appeal, that

---

[5] The motion pertains to the search on the date of the arrest, both at the convenience store and the sheriff's substation. A warrant for search of the truck was issued nine days later, which is not at issue.

[6] The State's attorney argued: "The search of the vehicle, your Honor, we would argue that search was lawful under the automobile exception to the warrant requirement." Appellant's attorney argued "Well, there's no automobile exception now, because the car is totally within the control of the Webb County Sheriff's Office."

argument is forfeited." *Copeland*, 501 S.W.3d at 612–13; *Snell v. State*, No. 01-22-00502-CR, 2023 WL 8587672, at *7 (Tex. App.—Houston [1st Dist.] Dec. 12, 2023, pet. ref'd, untimely filed) (mem. op., not designated for publication).[7]

### (1) Was Appellant's truck readily mobile?

In the trial court, Appellant challenged the "readily mobile" requirement of the automobile exception because the truck was brought to the station, where it was secured and the officers could have gotten a warrant before the search.

Less than a year ago, the Austin Court of Appeals issued its opinion in *Wilkes v. State* that thoroughly examined the history of the automobile exception to the warrant requirement of the Fourth Amendment and, in particular, the "readily mobile" requirement. 681 S.W.3d 843 (Tex. App.—Austin 2023, no pet.). The automobile exception was first recognized in 1925 with the Supreme Court's decision in *Carroll v. United States*, in which the Court upheld the warrantless search because a "vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." 267 U.S. 132, 153 (1925). Over time, the justifications for the exception evolved to include the "reduced expectation of privacy in an automobile" because of "pervasive regulation of vehicles." *Wilkes*, 681 S.W.3d at 848, *quoting California v. Carney*, 471 U.S. 386, 390 (1985) *and Pennsylvania v. Labron*, 518 U.S. 939, 940 (1996).

As the Supreme Court expanded the justifications for the warrantless search of vehicles, it also recognized that "a vehicles' ready mobility was an inherent quality and not dependent on the risk of fleeing before police could conduct a search." *Wilkes*, 681 S.W. 3d at 849. To illustrate this, the *Wilkes* court discussed three Supreme Court cases where the automobile exception applied

---

[7] Ordinarily, our opinion might end here. But the State also does not argue the automobile exception in its brief, other than to recite the trial court's relevant finding. We add the additional comments that follow only to show the correctness of the trial court's finding.

16

even though the vehicle was immobilized by law enforcement. *Id*., *Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (holding that police lawfully searched an impounded vehicle when they had probable cause to believe that it contained contraband); *Florida v. Meyers*, 466 U.S. 380, 382 (1984) (same); *United States v. Johns*, 469 U.S. 478, (1985) (holding that warrantless search of vehicle held at DEA headquarters was permissible because of probable cause). Of course, a vehicle cannot be held indefinitely before a warrantless search is conducted, but courts have upheld searches happening days following the seizure of the vehicle. *Wilkes*, 681 S.W.3d at 852 (five days); *Johns*, 469 U.S. at 487–88 (three days); *Cooper v. State of Cal*., 386 U.S. 58, 62 (1967) (seven days).

In this case, after Appellant fled and while officers were still searching for him, his truck was taken to the station. Although there was no danger once the vehicle was at the station that Appellant or anyone else would drive the truck away, it was readily mobile simply because of it being a vehicle. *Cf. Tollefson v. State*, 352 S.W.3d 816, 821 (Tex. App.—San Antonio 2011, pet. ref'd) (holding that the automobile exception did not apply to a trailer which was connected to utilities and could be moved only if hitched to another vehicle because it was not readily mobile). The search of the truck began almost immediately. The evidence log shows that they began to log evidence recovered from the truck at 3:54 a.m. that same morning.

### (2)   Did the officers have probable cause to conduct a search?

The second part of the exception asks whether there was probable cause for the warrantless search. "Probable cause exists where the facts and circumstances known to law enforcement officers are 'sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" *Marcopoulos*, 538 S.W.3d at 599–600, *quoting Brinegar v. United States*, 338 U.S. 160, 175–76 (1949). The word "probable" denotes "a 'fair probability'

17

of finding inculpatory evidence at the location being searched." *Neal v. State*, 256 S.W.3d 264, 282 (Tex. Crim. App. 2008). In making that assessment, we take into account "the totality of the circumstances" known to the officer, eschewing a "divide-and-conquer" or "piecemeal" approach. *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007).

The trial court did not make an express finding for probable cause, but its implied finding is well supported by the record. Erika communicated these facts to law enforcement before the search was conducted: a description of Appellant and his truck; that Appellant had contact with one of the victims shortly before her death; that he reacted strangely when she brought up the murders; and that he threatened Erika, also a prostitute like the other victims, by pointing a gun at her. DPS confirmed portions of her story by having her identify Appellant's residence.

When officers spotted Appellant's truck and saw him exit the convenience store, they tried to stop him. When asked, he confirmed that the truck was his. When they told him he was wanted for questioning related to the murders, he then fled, leaving the truck in a public place. An empty holster and two women's purses, one of which fit the description Erika gave of the purse she left behind, were on the floorboard of the truck in plain view. And when Appellant was located and placed in a vehicle for transport to the substation, he volunteered that the gun the officers in the squad car were looking for was in the door well of the truck. All these circumstances gave more than sufficient probable cause to search the vehicle for evidence related to an assault against Erika and the murders of the other known victims.

### B. Abandonment

A defendant lacks standing to contest the search of property that they have abandoned. *Matthews v. State*, 431 S.W.3d 596, 608–09 (Tex. Crim. App. 2014); *Vitela v. State*, 649 S.W.3d 649, 652 (Tex. App.—San Antonio 2022, pet. ref'd). Abandonment of a vehicle can occur when a

18

defendant flees law enforcement, leaving behind his vehicle. For example, in *Matthews*, the defendant ran from law enforcement leaving behind his vehicle with the keys in it. *Matthews*, 431 S.W.3d at 610. The defendant did not voluntarily return to his car, but only stopped running when the officer pointed a taser at him. The Court held that "[t]hese circumstances show that appellant intended to abandon any expectation of privacy in the van he left behind." *Id.*; *Barron v. State*, 671 S.W.2d 553, 555–56 (Tex. App.—Houston [14th Dist.] 1983, pet. ref'd) (defendant abandoned his vehicle when he left it, "with engine running, keys in the ignition, lights on, and fled on foot"); *cf. Marcopoulos*, 492 S.W.3d at 777 (holding that defendant who was pulled over for suspected drug possession and did *not* flee "maintained exclusive possession of the truck and made no attempt to abandon the truck"), *rev'd on other grounds*, 538 S.W.3d 596 (Tex. Crim. App. 2017).

Abandonment of vehicles presents unique issues—"cars are regularly parked on the street for brief periods of time without an expectation that they will thereby be subject to entry." *Matthews*, 431 S.W. at 609. The question is one of intent: did the defendant intend to abandon the vehicle. *Id.* Intent can be inferred from the circumstances and defendant's words and actions.[8] *Matthews*, 431 S.W.3d at 609; *McDuff v. State*, 939 S.W.2d 607, 616 (Tex. Crim. App. 1997) (en banc). "The issue is not whether he intended to discard the property permanently, but rather whether he abandoned the property in such a way 'that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.'" *Matthews*, 431 S.W.3d at 609, *quoting McDuff*, 939 S.W.2d at 616.

---

[8] Abandonment must also be voluntary and not caused by police misconduct. *Matthews v. State*, 431 S.W.3d 596, 609 (Tex. Crim. App. 2014). There is no argument in this case that the police acted unlawfully in approaching and attempting to detain Appellant before he fled.

We conclude that the record supports that trial court's finding that Appellant abandoned his vehicle. The trial court found that Appellant "fled from the police and away from his vehicle, after his initial and lawful detention, he abandoned any expectation of privacy for any property inside his vehicle[.]" Several circumstances from the record support that finding. Within the course of a month, Appellant had murdered two women. On that evening, he had allowed Ericka to escape and could reasonably expect that she might have gone to the authorities. He then approached and killed a third and fourth victim. Upon exiting the convenience store, he was confronted by two DPS troopers with guns drawn. One trooper specifically informed him he was being detained in connection with the murders. He paused briefly and then fled the scene, leaving his truck behind. Given his sophistication with law enforcement, he would have well known that he could not return to his truck which would be (and was) placed under surveillance by the DPS during the extended chase and search for him. The record also shows that Appellant knew that law enforcement would be searching for him and that when he was found, he would be arrested. After Erika escaped, he went back to his house and arrayed guns in his kitchen as if preparing for a standoff. When discovered hiding in the bed of a pickup following the chase, he told an officer "Go ahead. Take your trophy shot. Take your pick."

Collectively, these facts support a finding that Appellant had no intent to retrieve his truck or expect to retain it as a private place. We do not suggest that every instance where a person lawfully parks their vehicle and then avoids contact with the police proves abandonment. But given the gravity of the charges that faced Appellant, his certain knowledge the law enforcement was pursing him for those crimes, and his apparent state of mind, his flight here under our deferential standard, supports the trial court's conclusion of abandonment.

## CONCLUSION

The trial court properly denied the motion to suppress the statements and confessions made by Appellant and the search of his truck. His two issues on appeal are overruled. The trial court's judgment is affirmed.

JEFF ALLEY, Chief Justice

May 15, 2024

Before Alley, C.J., Palafox and Soto, JJ.

(Do Not Publish)